**Michael BOWERS, Plaintiff,**

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ACT, INC., NCAA Initial–Eligibility Clearinghouse, Temple University of the Commonwealth System of Higher Education, University of Iowa, American International College, Defendants.**

**No. Civ. A. 97–2600.**

United States District Court,
D. New Jersey.

June 8, 1998.

---

**464**

Barbara E. Ransom, Public Interest Law Center of Philadelphia, Philadelphia, PA, Penelope A. Boyd, Mount Laurel, NJ, Richard L. Bazelon, Bazelon & Less, Marlton, NJ, for Plaintiff, Michael Bowers.

Charles J. Vinicombe, J. Freedley Hunsicker, Jr., John Schultz, Julianne Peck, Drinker, Biddle & Reath LLP, Philadelphia, PA, for Defendant, National Collegiate Athletic Association.

Robert A. Burgoyne, Fulbright & Jaworski LLP, Washington, DC, Nicholas M. Kouletsis, Pepper, Hamilton & Scheetz, LLP, Cherry Hill, NJ, for Defendants, ACT, Inc. and NCAA Initial–Eligibility Clearinghouse.

Mark Schantz, Andrew Ives, Office of the General Counsel, Iowa City, IA, Thomas J. Miller, Attorney General, Gordon E. Allen, Deputy Attorney General, Office of the Iowa Attorney General, Des Moines, IA, for Defendant, University of Iowa.

John B. Langel, Abigail L. Flitter, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, for Defendant, Temple University of the Commonwealth System of Higher Education.

Thomas C. Hart, Ruprecht & Hart, LLP, Millburn, NJ, for Defendant, American International College.

Isabelle Katz Pinzler, Acting Assistant Attorney General, John L. Wodatch, L. Irene Bowen, Philip L. Breen, Daniel W. Sutherland, Disability Rights Section, Civil Rights Division, United States Department of Justice, Washington, DC, Faith S. Hochberg, United States Attorney, Louis J. Bizzarri, Assistant United States Attorney, Mitchell H. Cohen, Camden, NJ, for Amicus Curiae, United States of America.

## OPINION

ORLOFSKY, District Judge.

### Table of Contents

I. Facts and Procedural History ............................................. 466
 A. Procedural History ................................................... 466
 B. Michael Bowers ...................................................... 467
 C. The NCAA ........................................................... 467
 D. Initial Eligibility Status and the Clearinghouse ...................... 467
 E. Bowers' Application to the Clearinghouse .............................. 468
 F. Efforts to Recruit Bowers ............................................ 469

II. Standards on Motions to Dismiss and For Summary Judgment ................ 470
 A. Motion to Dismiss .................................................... 470
 B. Motion for Summary Judgment .......................................... 470

III. Discussion ............................................................. 472
 A. The Nature of the NCAA ............................................... 472
 B. Americans with Disabilities Act (Count I) ............................ 473
 1. Title II Claim as Against Iowa .................................... 475
 a. Disability Under the ADA ....................................... 475
 b. By Reason of Such Disability ................................... 476
 c. Qualified Individual with a Disability ......................... 477
 2. Title III Claim as Against the NCAA, ACT, and the Clearinghouse .... 479
 a. ACT and the Clearinghouse ...................................... 480
 b. The NCAA ....................................................... 483
 i. Place of Public Accommodation ............................... 483

 ii. Operates a Place of Public Accommodation and Enjoyment of
 a Place of Public Accommodation .............................485
 iii. Discrimination under Title III ...............................490
 C. Rehabilitation Act (Count II) ......................................490
 1. Disability ........................................................490
 2. Program or Activity ..........................................491
 3. Federal Financial Assistance .....................................492
 4. Otherwise Qualified Individual and Discrimination Solely by Reason
 of Disability ......................................................494
 D. New Jersey Law Against Discrimination (Count IV) ........................494
 1. Place of Public Accommodation under the NJLAD ......................495
 2. Liability under the NJLAD .........................................497
 E. Sherman Act (Count III) ............................................497
 F. Contract (Count V) .................................................498

IV. Conclusion ...............................................................499

This case is about Plaintiff's eligibility to participate in intercollegiate athletics during his freshman year of college. The National Collegiate Athletic Association, the governing body of intercollegiate athletics, has promulgated regulations which determine whether a student-athlete is a "qualifier," "partial qualifier," or "nonqualifier," and thereby whether a student-athlete is eligible to compete in intercollegiate athletics during his or her freshman year. Plaintiff, a promising football player, was determined to be a "nonqualifier," and therefore ineligible for intercollegiate football competition during his freshman year of college. Plaintiff then filed this action claiming, among other things, that his status as a "nonqualifier" was assigned in a fashion that discriminates against the learning disabled in violation of several federal and New Jersey statutes, in particular, the Americans with Disabilities Act, the Rehabilitation Act, and the New Jersey Law Against Discrimination.

Complicating this litigation somewhat is the fact that a student-athlete's initial eligibility status is not determined by the particular college or university to which he or she applies for admission. Rather, the National Collegiate Athletic Association, an unincorporated association of many colleges and universities throughout the United States, has adopted regulations which are binding upon its members to determine the initial eligibility status of freshman athletes. In turn, a separate private corporation, ACT, Inc., by contract with the NCAA and upon the payment of a fee by the student and the receipt of certain information from a student and the

student's high school, then applies these criteria in order to assign a student his or her initial eligibility status. This web of interactions and relationships among several different entities creates difficulties in applying the ADA, the Rehabilitation Act, and the NJLAD. Compounding these difficulties is the fact that the federal courts which have considered how and to what extent the ADA and Rehabilitation Act apply to the NCAA and its eligibility rules have arrived at different results, or at the same result by radically different paths.

The Complaint filed in this case by Plaintiff, Michael Bowers, alleges claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (Count I), section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) (Count II), the Sherman Act, 15 U.S.C. §§ 1 *et seq.* (Count III), the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1 *et seq.* (Count IV), and a claim for breach of contract under New Jersey law (Count V). Defendant, the National Collegiate Athletic Association, has moved to dismiss the ADA, Rehabilitation Act, LAD, and Sherman Act claims or, in the alternative, for summary judgment on these claims. Defendants, ACT, Inc. and the NCAA Initial–Eligibility Clearinghouse, have moved to dismiss all five counts alleged in the Complaint or, in the alternative, for summary judgment on these claims. Finally, Defendant, the University of Iowa, has moved to dismiss the ADA, Rehabilitation Act, and Sherman Act claims or, in the alternative, for summary judgment on these claims.

For the reasons set forth below, the ADA claim (Count I) will be dismissed with prejudice as to ACT, Inc. and the NCAA Initial–Eligibility Clearinghouse. The Sherman Act claim (Count III) will be dismissed with prejudice as to ACT, Inc., the NCAA Initial–Eligibility Clearinghouse, the NCAA, the University of Iowa, as well as the non-moving Defendants, Temple University of the Commonwealth System of Higher Education and American International College. In all other respects, Defendants' motions will be denied.

## I. Facts and Procedural History

### A. Procedural History

On May 23, 1997, Plaintiff, Michael Bowers ("Bowers"), filed a Complaint in this Court alleging that Defendants, the National Collegiate Athletic Association (the "NCAA"), Cedric Dempsey ("Dempsey"), the Executive Director of the NCAA, the NCAA Initial–Eligibility Clearinghouse (the "Clearinghouse"),[1] and Calvin Symons ("Symons"), Managing Director of the Clearinghouse, violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. (the "ADA"), section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and the Sherman Act, 15 U.S.C. §§ 1 et seq. See, e.g., Compl. ¶¶ 77–137.

On June 6, 1997, pursuant to Rule 65 of the Federal Rules of Civil Procedure, Bowers moved for a preliminary injunction on the ADA claim. After the motion was filed, I instructed the NCAA to determine, on an expedited basis, whether Bowers was entitled to a waiver of the initial eligibility requirements pursuant to section 14.3.1.7 of the NCAA's Bylaws. See NCAA Manual § 14.3.1.7 (1995–96 ed.) (hereinafter NCAA Manual). The subcommittee which was convened to evaluate Bowers' entitlement to a waiver found that Bowers was not so entitled. See Bowers v. National Collegiate Athletic Ass'n, 974 F.Supp. 459, 463–64 (D.N.J. 1997) (Bowers I ).[2]

On August 14, 1997, after a hearing lasting several days, I denied the motion for a preliminary injunction. See id. at 460 n. 1, 461. I found that Bowers had not demonstrated a likelihood of success on the merits of the ADA claim. Id. at 466–67 & n. 3. On August 22, 1997, Bowers filed a notice of appeal to the Court of Appeals for the Third Circuit of the denial of the motion for a preliminary injunction. Bowers ultimately withdrew the appeal. On September 8, 1997, Bowers filed the First Amended Complaint realleging causes of action under the ADA, the Rehabilitation Act, and the Sherman Act. He also added causes of action under the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1 et seq. (the "NJLAD"), against the NCAA, ACT, Inc. ("ACT"), and the Clearinghouse, and for breach of contract under New Jersey law against ACT and the Clearinghouse. See Amended Compl. at ¶¶ 145–254 & p. 38. The First Amended Complaint dropped Dempsey and Symons as Defendants and added as Defendants, ACT, Temple University of the Commonwealth System of Higher Education ("Temple"), the University of Iowa ("Iowa"), and American International College ("AIC").

■ While the First Amended Complaint is neither short, nor plain, nor indeed even confined to statements of fact as Rule 8 of the Federal Rules of Civil Procedure generally requires, I briefly summarize the central aspects of Bowers' factual allegations as contained in the First Amended Complaint.[3]

---

1. The Complaint identified the Clearinghouse as the NCAA Student–Eligibility Clearinghouse. See Complaint ¶ 20 (dated May 23, 1997) (hereinafter Compl.).

2. Prior to August 1996, a waiver request could be initiated only by an NCAA member-institution. However, effective August 14, 1996, an individual student may now seek a waiver on his or her own behalf. See Bowers I, 974 F.Supp. at 465–66; see also First Amended Complaint ¶¶ 128, 213–14 (dated Sept. 8, 1997) (hereinafter Amended Compl.); Ganden v. National Collegiate Athlet-

ic Ass'n, 1996 WL 680000, *3 & n. 3 (N.D.Ill. Nov. 21, 1996).

3. I summarize the facts as alleged in the First Amended Complaint, not as found after the preliminary injunction hearing. The factual findings entered in connection with the denial of the preliminary injunction, Bowers I, 974 F.Supp. at 461–64, are not binding on the Court in considering a motion to dismiss or, in the alternative, for summary judgment. Nor are the conclusions of law entered in connection with the injunction considered the law of the case. See University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct.

## B. Michael Bowers

Bowers is a resident of Palmyra, New Jersey and currently a student at Temple. Amended Compl. at ¶¶ 8, 90. Throughout his primary and secondary school education, Bowers received special education and related services as a result of a learning disability. *Id.* at ¶¶ 5–6, 91–95. Bowers' learning disability, identified more formally as a perceptual impairment, "affects his ability to achieve in spite of his intellectual ability, and ... interferes with his reading and writing skills." *Id.* at ¶ 146. Bowers is also a talented football player and during high school was heavily recruited by several Division I and II colleges and universities to play football at the collegiate level, including Temple, Iowa, and AIC. *See id.* at ¶¶ 2–3, 57–59, 68–73, 80–81, 113–114.

## C. The NCAA

The NCAA is a not-for-profit unincorporated association of approximately 1,200 educational institutions in the United States with its principal place of business in Kansas. *Id.* at ¶ 9. The NCAA is the "predominant governing body in college sports" and one of its stated purposes is to "maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports." *Id.* at ¶¶ 10, 19.

The members of the NCAA (the "member-institutions") are grouped into distinct divisions. The distinctions among the divisions determine, *inter alia,* the scope of the athletic program, the level of competition, and the amount of financial aid distributable through

its athletic program. *Id.* at ¶¶ 23–24. For example, Division I members "recruit[ ] regionally and nationally" and sponsor "one or both of the traditional spectator-oriented, income producing sports of football and basketball" "at the highest feasible level of intercollegiate competition." *Id.* at ¶ 23 (citing NCAA Manual at § 20.9(e)).

Among the member-institutions of the NCAA are Temple, Iowa, and AIC, as well as several colleges and universities located in New Jersey, including Rutgers University, William Paterson College, and the College of New Jersey. *Id.* at ¶¶ 13, 56, 64, 76. Temple and Iowa are Division I members, and AIC is a Division II member. *Id.* at ¶¶ 56, 64, 76.

Since 1969, the NCAA has received federal funds for its National Youth Sports Program. *See id.* at ¶¶ 26–27. Also, "[m]ember-institutions pay the NCAA dues from revenues obtained from the tuition and activity fees of the student body, including money paid in whole or part with federal funds." *Id.* at ¶ 15.

## D. Initial Eligibility Status and the Clearinghouse

Among its other activities, the NCAA establishes the standards to determine whether an incoming freshman student is eligible to participate in intercollegiate athletics at the Division I or Division II level. This determination is known as a student's "initial eligibility." *See, e.g., id.* at ¶¶ 16, 25, 100, 121. There are three possible initial eligibility statuses: "qualifier," "partial qualifier," or "nonqualifier." *Id.* at ¶ 122. In combination with whether or not a student has been recruited by a member-institution, a student's initial

1830, 68 L.Ed.2d 175 (1981); *Society of the Roman Catholic Church of the Diocese of Lafayette, Inc. v. Interstate Fire & Casualty Co.,* 126 F.3d 727, 735–36 (5th Cir.1997) (noting effect of different evidentiary standards on direct appeal and on interlocutory appeal of preliminary injunction); *United States v. Local 560 (I.B.T.),* 974 F.2d 315, 330 (3d Cir.1992) (holding that "a trial court, in deciding whether to grant permanent relief, is not bound by its decision ... about preliminary relief" and that "a decision on a preliminary injunction is, in effect, only a prediction about the merits of the case"); *Goodheart Clothing, Inc. v. Laura Goodman Enterprises,*

*Inc.,* 962 F.2d 268 (2d Cir.1992) (noting that "it would ... be anomalous ... to regard the [district court's] initial ruling as foreclosing the subsequent, more thorough consideration of the merits that the preliminary injunction expressly envisions"). The parties agree that the legal conclusions entered as part of the preliminary injunction hearing are not the law of the case. *See* Transcript 4–5 (dated Nov. 19, 1997) (hereinafter Trans.). *But see* NCAA's Memorandum of Law 15 (dated Sept. 29, 1997) (hereinafter NCAA's Memorandum) (asserting that "the law of the case requires dismissal or the entry of summary judgment in the NCAA's favor").

eligibility status determines, *inter alia:* whether and when he or she may compete in intercollegiate athletics; whether, when, and with whom he or she may practice or engage in conditioning; and whether and from what sources of funds a student may receive institutional financial aid or an athletic scholarship. *See, e.g., id.* at ¶¶ 97–98, 135–139; *see generally* NCAA Manual at § 14.3. These requirements are separate from and in addition to the individual member-institutions' requirements for admission. *See* Amended Compl. at ¶ 100.

Initial eligibility status is a function of a number of factors, including, whether a student has graduated from high school, a student's Scholastic Aptitude Test ("SAT") score, and a student's grade-point average in "core courses," of which the student must pass a total of thirteen. *Id.* at ¶¶ 98, 122. For Division I eligibility, the core course requirements are four units of English, two units of mathematics, two units of science, two units of social science, one additional unit of English, mathematics, or science, and two additional units of core courses in certain areas. The Division II core course requirements vary slightly from those for Division I. *Id.* at ¶ 99; *see also* NCAA Manual at § 14.3.1.

Under NCAA rules, courses which "are taught at a level below the high school's regular instructional level (*e.g.,* remedial, special education, or compensatory) [are not] considered core courses regardless of course content." *Id.* at ¶ 105 (emphasis added). However, courses for students with learning disabilities may be accepted as core courses if "the high school principal submits a written statement to the NCAA indicating that students in such classes are expected to acquire the same knowledge, both quantitatively and qualitatively, as students in other core courses." *See id.* at ¶ 126.

The actual determination of a student's initial eligibility status is made by the Clearinghouse. The Clearinghouse was established by contract between ACT and the

NCAA. *Id.* at ¶ 35. ACT is a non-profit corporation with its principal place of business in Iowa. *Id.* at ¶ 33. ACT operates the Clearinghouse and enforces the initial eligibility requirements established by the NCAA. *See id.* at ¶¶ 35, 44–47. ACT and the Clearinghouse are agents of the NCAA member-institutions for the purpose of determining initial eligibility. *Id.* at ¶ 36. The Clearinghouse, however, operates according to procedures designed by ACT. *Id.* at ¶¶ 37–38, 42, 48–52.

In addition to charging students a fee to determine their initial eligibility, *see, e.g., id.* at ¶ 116, "ACT assesses individual NCAA member-institutions a fee to produce a report on student athlete prospects ... The member-institutions pay [these] fees from revenues obtained from the tuition and activity fees paid by the student body, including money paid in whole or in part with federal funds." *Id.* at ¶ 41. ACT also receives federal funds in the form of research grants in connection with the operation of a standardized educational assessment service. *Id.* at ¶ 39.

### E. Bowers' Application to the Clearinghouse

On or about September 13, 1995, Bowers paid an $18 fee to ACT in order for the Clearinghouse to evaluate his initial eligibility application. *Id.* at ¶ 116. This evaluation included an evaluation of Bowers' high school transcript which denominated Bowers' special education courses as such. *See, e.g., id.* at ¶¶ 95–96, 132. On April 16, 1996, the Clearinghouse informed Bowers' high school, Palmyra High School, of the procedures it would employ to "approve the use of non-standard tests ... and use high school courses designated for students with learning disabilities to satisfy core course requirements." *Id.* at ¶ 129. The Clearinghouse requested, among other things, a copy of the application to take a standardized test under non-standard conditions and a copy of the student's IEP,[4] as well as descriptions of his

---

4. IEP stands for individualized education program and is "a statement of the student's instructional guide and basic plan which [a] [s]chool [d]istrict uses to determine placement and partic-

ipation in regular education and/or special education programs with the appropriate curricular or instructional modifications." *See, e.g.,*

learning disabled courses, course syllabi, and information from the high school principal regarding the relationship between "regular academic course[s]" and the "comparable learning disabled course[s]." *See id.*

Shortly thereafter, Palmyra High School began to provide that information to the Clearinghouse. On April 25, 1996, the principal of Palmyra High School informed the Clearinghouse that "[s]tudents in [special education] classes are expected to acquire the same knowledge, both quantitatively and qualitatively, as students in comparable course(s). The same grading standards are employed in such classes as those utilized in this (these) course(s)." *Id.* at ¶ 127; *see also id.* at ¶ 4. On May 17, 1996, Dori Levy, the Director of Special Services of Palmyra Public Schools, identified Bowers as a student with an IEP and informed the Clearinghouse that she administered an untimed SAT exam for him. *Id.* at ¶ 131. At some point before June 7, 1996, "information about all of [Bowers'] courses including [t]able[s] of [c]ontents and course descriptions, proficiencies, outlines, and objectives" was submitted to the Clearinghouse. *Id.* at ¶ 132.

On July 30, 1996, "the NCAA through its Clearinghouse" notified Bowers of the final determination that he was a nonqualifier. *See id.* at ¶ 133. Among various deficiencies, the Clearinghouse determined that Bowers lacked two years of social studies, three years of English, and the requisite additional core courses, and that his application lacked documentation required to accept standardized test scores achieved under nonstandard testing conditions. *Id.; see generally id.* at ¶ 99. Bowers was only given core course credit for three of his high school courses. *Id.* at ¶ 160.

As a result of his status as a nonqualifier, Bowers "is ineligible to compete in intercollegiate football" for some period of time, may not practice or condition with qualifiers, may not compete in intercollegiate football for the maximum number of seasons, and may not receive an athletic scholarship. *Id.* at ¶ 135; *id.* at ¶ 136 (alleging that Bowers will "lose[ ] two years of playing eligibility and will be required to compete against upper-class

Amended Compl. at ¶ 93 (citing N.J.A.C. 6:28– 3.6).

players who have had the advantage of college-level training, conditioning, and/or competition"); *id.* at ¶ 137 (alleging that as a result of nonqualifier status Bowers "lost any possibility of receiving a full athletic scholarship to any Division I or Division II" school for the 1996–97 school year); *id.* at ¶ 138 (alleging that Temple "could not offer Bowers a scholarship, nor could it allow him to practice or compete in its athletic program"); *id.* at ¶ 142 (alleging that Temple assistant football coach notified Bowers that he "would not be eligible for 'qualifier' status until the 1998–99 school year, approximately two years after his registration"); *id.* at 227 (noting that denial of qualifier status resulted in loss of athletic scholarship, loss of at least two years of playing eligibility, and "diminution of [Bowers'] competitive football skills and prospects as a professional athlete"); *id.* at ¶ 229. In the Spring of 1997, Bowers enrolled at Temple as a full-time student. *Id.* at ¶ 140. Bowers received $2,275 in need-based financial aid from Temple. *Id.* at ¶ 141.

### F. Efforts to Recruit Bowers

Among other schools, Temple, Iowa, and AIC were interested in recruiting Bowers for their football programs. *See, e.g., id.* at ¶¶ 57–59, 69–74, 80. All of the efforts to recruit Bowers hinged, to some extent, on his attaining qualifier status. *See, e.g., id.* at ¶¶ 61, 73–74, 84, 124. After Temple requested an unofficial copy of Bowers' high school transcript, Temple's football recruiter determined that the Clearinghouse would not deem Bowers to be a qualifier. Accordingly, Temple discontinued its efforts to recruit Bowers for its football program, thereby effectively ending his chances of receiving an athletic scholarship from Temple. *See id.* at ¶¶ 59, 61, 137. Similarly, after some initial recruiting contacts with Bowers, a representative of Iowa assured Bowers' mother that, if the Clearinghouse identified Bowers as a qualifier, he would receive a full scholarship. *Id.* at ¶ 73. After Bowers was designated a nonqualifier, Iowa terminated its efforts to recruit Bowers. *Id.* at ¶ 74. Finally, after

some initial contacts with Bowers, AIC discontinued its interest in Bowers as a football recruit once Bowers was designated a non-qualifier. *Id.* at ¶ 84; *see also id.* at ¶ 124.

Temple, Iowa, and AIC did not offer to apply for a waiver of some or all the initial eligibility requirements on Bowers' behalf. Nor did Temple, Iowa, and AIC inform Bowers of the existence of a waiver procedure. *Id.* at ¶¶ 62, 75, 85; *see also id.* at ¶ 128 (noting that only NCAA member-institutions had right to appeal determination of eligibility status).

The Court may exercise jurisdiction over the ADA and Rehabilitation Act claims pursuant to 28 U.S.C. §§ 1331, 1343. The Court may exercise jurisdiction over the Sherman Act claim pursuant to 28 U.S.C. § 1337(a). *See* Amended Compl. at ¶ 89. Finally, the Court may exercise jurisdiction over the NJLAD and contract claims pursuant to 28 U.S.C. § 1367.[5]

## II. Standards on Motions to Dismiss and for Summary Judgment

The NCAA, ACT and the Clearinghouse, and Iowa have all moved to dismiss Bowers' various claims or, in the alternative, for summary judgment. I review the motions in the light of the following standards.

### A. Motion to Dismiss

In considering a motion to dismiss under Rule 12(b)(6), the Court may only dismiss a claim if it appears certain that the plaintiff cannot prove any set of facts in support of his or her claims which would entitle him or her to relief. *See, e.g., Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). While all well-pled allegations are accepted as true and reasonable inferences are drawn in the plaintiff's favor, *see, e.g., Gomez v. Toledo,* 446 U.S. 635, 636, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990), the Court may dismiss a claim where, under any set of facts which could be shown to be consistent with a complaint, the plaintiff is not entitled to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Neitzke v. Williams,* 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (rule 12(b)(6) does not countenance dismissals based on judge's disbelief of a complaint's factual allegations).

### B. Motion for Summary Judgment

To the extent I consider matters outside the pleadings, I will treat the motion as one for summary judgment and dispose of the motions as provided for by Rule 56. *See* Fed.R.Civ.P. 12(b). A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see, e.g., Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996); *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219 n. 3 (3d Cir.1988), *cert. denied,* 490 U.S. 1098, 109

---

5. Bowers does not allege an independent jurisdictional basis for the NJLAD and contract claims. For example, Bowers does not allege complete diversity of citizenship such that the Court could exercise jurisdiction over the NJLAD claim pursuant to 28 U.S.C. § 1332(a). This would appear difficult, if not impossible, since Bowers is a citizen of New Jersey and several members of the NCAA are also citizens of New Jersey. *See, e.g.,* Amended Compl. at ¶¶ 8, 13; *see also Guerrero v. Bluebeard's Castle Hotel Inc.,* 982 F.Supp. 343, 347 (D.Vi.1997) (noting that "association is not a separate legal entity for purposes of citizenship, but rather is a citizen of every state . . . in which any of its members is a citizen" and citing *Carden v. Arkoma Assocs.,* 494 U.S. 185, 195–96, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990)).

In connection with the contract claim, Bowers does not allege any amount in controversy, let alone one in excess of $75,000. Nor does he appear to invoke diversity jurisdiction in any other fashion. *See, e.g.,* Amended Compl. at ¶¶ 87–89, 246–54; *see generally St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288–89, 58 S.Ct. 586, 82 L.Ed. 845 (1938) ("the rule governing dismissal for want of jurisdiction in cases brought in federal court is that, unless the law gives a different rule, the sum *claimed by the plaintiff* controls if the claim is apparently made in good faith") (emphasis added); *Suber v. Chrysler Corp.,* 104 F.3d 578, 583 (3d Cir.1997) (Becker, J.) (holding that *"once a good faith pleading of the amount in controversy vests the district court with diversity jurisdiction,* the court retains jurisdiction even if the plaintiff cannot ultimately prove all of the counts of the complaint or does not actually recover damages in excess of" the amount in controversy required by 28 U.S.C. 1332) (emphasis added).

S.Ct. 2449, 104 L.Ed.2d 1004 (1989); *Hersh v. Allen Prod. Co.*, 789 F.2d 230, 232 (3d Cir.1986).

In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See, e.g., Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir.1987); *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).

In deciding whether triable issues of fact exist, Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). The rule does not increase or decrease a party's ultimate burden of proof on a claim. Rather, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 255–56, 106 S.Ct. 2505.

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material

fact remains. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented ... by depositions, answers to interrogatories, or further affidavits," *id.*, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 ("by its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion ...; the requirement is that there be no *genuine* issue of *material* fact") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lujan v. National Wildlife Fed.*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("[t]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit"); *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992) ("to raise a genuine issue of material fact ... the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather must exceed the "'mere scintilla' threshold"), *cert. denied*, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

Finally, Rule 56(f) provides that:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be

had or may make such other order as is just.

*See* Fed.R.Civ.P. 56(f). In contrast to other circuits, the Third Circuit has consistently "underscored the benefits of technical compliance" with Rule 56(f). *St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1313–14 (3d Cir.1994); *compare, e.g., International Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1267 (5th Cir.1991) (requiring only statement of party's need for additional discovery), *cert. denied*, 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). In particular, our Circuit has stressed the requirement that the party opposing the motion actually file an affidavit "identifying their inability to effectively oppose the summary judgment motion." *Lunderstadt v. Colafella*, 885 F.2d 66, 70 (3d Cir.1989).

"Failure to support a Rule 56(f) motion by affidavit is not automatically fatal to its consideration," as long as the party opposing summary judgment "still identif[ies] with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." *St. Surin*, 21 F.3d at 1314 (quoting *Lunderstadt*, 885 F.2d at 71 (quoting *Dowling v. City of Philadelphia*, 855 F.2d 136, 140 (3d Cir.1988)); *see also San Filippo v. Bongiovanni*, 30 F.3d 424, 432 (3d Cir.1994), *cert. denied*, 513 U.S. 1082, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995). "While the decision to grant a Rule 56(f) motion lies within the district court's discretion, the motion should be granted almost as a matter of course unless the information is otherwise available to the nonmovant." *Russek v. Unisys Corp.*, 921 F.Supp. 1277, 1285 (D.N.J. 1996) (citations omitted).

## III. Discussion

I review each of Bowers' five claims *seriatim* to determine whether Bowers has stated a claim and, if so, whether any of the moving Defendants is entitled to summary judgment on the claim. Before I do so, I must deal with several issues, or should I say, nonissues, related to the nature of the NCAA, to which Bowers devotes far more argument than is necessary.

## A. The Nature of the NCAA

Bowers alleges that the NCAA is an unincorporated association. Amended Compl. at ¶ 9. Pursuant to Rule 17(b) of the Federal Rules of Civil Procedure, an unincorporated association may be sued in its common name for the purpose of enforcing against it a substantive right existing under federal law or the Constitution. *See* Fed. R.Civ.P. 17(b)(1); *see, e.g., University of Texas at Austin v. Vratil*, 96 F.3d 1337, 1339 (10th Cir.1996). Thus, the NCAA may properly be sued under the ADA, the Rehabilitation Act, and the Sherman Act.

With respect to non-federal, non-constitutional claims, the capacity of an unincorporated association to be sued under state law "shall be determined by the law of the state in which the district court is held." Fed.R.Civ.P. 17(b). Under New Jersey law, the NCAA may be sued in its common name. *See* N.J.S.A. 2A:64–1 ("[a]ny unincorporated organization or association, consisting of 7 or more persons and having a recognized name, may sue or be sued in any court of this state by such name in any civil action affecting its common property, rights and liabilities").

There is an exception to the New Jersey rule where equitable actions against, *inter alia*, not-for-profit, unincorporated associations, such as the NCAA, are involved. *See* Amended Compl. at ¶ 9; N.J.S.A. 2A:64–6 ("[N.J.S.A. A:64–1 through –5], in so far as [they] relate[ ] to actions of an equitable nature against unincorporated organizations or associations, shall not apply to a fraternal, charitable or other organization not organized for pecuniary profit"); *see, e.g., Davidson v. Roselle Park Soccer Federation*, 304 N.J.Super. 352, 355, 700 A.2d 900 (Ch.Div. 1996) (holding that youth soccer league was not organized for profit and therefore could not be liable for attorney's fees and costs in connection with grant of preliminary injunction under NJLAD).

The exception is not applicable in this case, however, because the relief sought on Bowers' NJLAD claim is not equitable. The NJLAD provides for, and Bowers has demanded, a jury trial, as well as compensatory and punitive damages, *see, e.g., D.B. v.*

*Bloom,* 896 F.Supp. 166, 171 (D.N.J.1995), most of which are indicia of legal, rather than equitable, relief. *See* Amended Compl. at p. 38; *see generally Montells v. Haynes,* 133 N.J. 282, 287–88, 627 A.2d 654 (1993) (discussing amendments to NJLAD which responded to *Shaner v. Horizon Bancorp,* 116 N.J. 433, 561 A.2d 1130 (1989), and are incorporated in, *inter alia,* N.J.S.A. 10:5–3 and –13). Thus, the NCAA may properly be sued under the NJLAD.

At this point in the litigation, Bowers need not have alleged or discussed anything more with respect to the "associational nature of the NCAA." Plaintiff's Response to Motions 11 (dated Oct. 15, 1997) (hereinafter Plaintiff's Brief). Accordingly, I need not address any other issues with respect to the nature of the NCAA, for example, the issue of whether a member of an association may assert a cross-claim against the very association of which it is a member. *See, e.g.,* Answer with Separate Defenses and Crossclaims of Defendant, AIC at p. 24 (dated Jan 13, 1998); *see generally Buteas v. Raritan Lodge # 61 F & A.M.,* 248 N.J.Super. 351, 591 A.2d 623 (App. Div.1991) (Pressler, P.J.).

As another example, I need not decide any issues with respect to Rule 23.2 of the Federal Rules of Civil Procedure. This rule permits, *inter alia,* a plaintiff to name certain representative members of an unincorporated association as a mechanism to proceed against all of the members of the association as a class. If Bowers intends to proceed as a class action with respect to the NCAA by naming certain members as representative parties under Rule 23.2, *see* Plaintiff's Brief at 10–11 & n. 8, this is far from clear on the face of the First Amended Complaint. Even if it were, it is not at all clear that the NCAA would even qualify as an entity which could be sued under Rule 23.2 since, after all, the NCAA is not (and cannot logically be) a member, within the meaning of Rule 23.2, of itself. *See* 5 James Wm. Moore, *et al., Moore's Federal Practice* § 23.2.08. Also, regardless of which interpretation of Rule 23.2 is the prevailing one within the Third Circuit, *see id.* at § 23.3.05, it may be somewhat odd for Bowers to proceed against the NCAA directly under Rule 17(b) and

N.J.S.A. 2A:64–1, at the same time that he also proceeds against certain representative members of the NCAA under Rule 23.2. *See Patrician Towers Owners, Inc. v. Fairchild,* 513 F.2d 216, 221 (4th Cir.1975) (considering "whether in a single cause of action a representative action is maintainable under Rule 23.2 when joined (and joined voluntarily by the plaintiffs themselves) with an action brought by the party for whose benefit the representative action is sought to be asserted" and discussing *Coniglio v. Highwood Servs., Inc.,* 60 F.R.D. 359 (W.D.N.Y.1972), *aff'd on other grounds,* 495 F.2d 1286 (2d Cir.1974)); *see also* 5 *Moore's Federal Practice* at § 23.3.09; *cf. Vratil,* 96 F.3d at 1340 (holding that district court erred in treating members of association who were unserved and not parties to litigation as "real parties in interest" for discovery purposes, where true defendant was association).

Finally, whatever Bowers may assert about "common law agency principles," Plaintiff's Brief at 9, the Supreme Court has precluded the extension of liability under federal statutes to those who are not embraced as potential defendants by the language of a statute. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 182–83, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (no precedent for proposition that aiding and abetting liability should attach to all federal statutes absent specific statutory aiding and abetting provision); *see, e.g., Mruz v. Caring, Inc.,* 991 F.Supp. 701, 709 (D.N.J.1998). As I am not presented with these issues, I express no view as to how they should be resolved. In any event, Bowers need not confuse substantive rights and liabilities with the procedural mechanisms by which those rights may be enforced or those liabilities may be determined. *See, e.g.,* Plaintiff's Brief at 8–12. I now turn to Bowers' five separate causes of action.

**B. Americans with Disabilities Act (Count I)**

Bowers asserts his ADA claim against the NCAA, ACT and the Clearinghouse, Temple, Iowa, and AIC. There are two basic provisions of the ADA under which Bowers sues. The first is section 12132:

Subject to the provisions of this subchapter [42 U.S.C. §§ 12131–12165], no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. This provision applies to Bowers' ADA claim against Iowa and Temple and not to his ADA claim against the NCAA, ACT and the Clearinghouse, and AIC. A "public entity" is defined, in relevant part, as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B). Conversely, a private entity is "any entity *other than* a public entity (as defined in section 12131(1) of this title)." *Id.* at § 12181(6) (emphasis added). Thus, regardless of Bowers' assertion to the contrary, *see* Amended Compl. at ¶ 151, Iowa and Temple, to the extent they are instrumentalities of the states of Iowa and Pennsylvania, are both potentially subject to Title II of the ADA, but not Title III. *See id.* at ¶ 150; *see generally Skehan v. State Sys. of Higher Ed.*, 815 F.2d 244, 248–49 (3d Cir.1987) (discussing "criteria to consider in determining whether an agency possesses sufficient state attributes to warrant" Eleventh Amendment immunity); *Van Pilsum v. Iowa State Univ. of Science & Technology*, 863 F.Supp. 935, 936–39 (S.D.Iowa 1994).

The second provision of the ADA under which Bowers sues is section 12182(a) which applies to Bowers' claim against the NCAA, ACT and the Clearinghouse, and AIC. This section provides as a general rule that:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

■ Notwithstanding Bowers' allegation and argument to the contrary, *see* Amended Compl. at ¶ 154; Plaintiff's Brief at 15–17 & 15 n. 15, Title III, not Title II, applies to the NCAA. An unincorporated association of many colleges and universities, some of the members of which are state colleges and universities, does not fit at all neatly within the definition of "public entity" as defined by section 12131(1)(B). Because "private entity" is defined to capture everything which is not a "public entity," the NCAA fits much more cleanly and logically within the language of section 12181(6).

Bowers cites no persuasive case which stands for the proposition that the NCAA is subject to Title II of the ADA simply because among its many members are state colleges and universities. Nor does Bowers cite any case which stands for the proposition that the NCAA is subject to both Titles II and III. Indeed, numerous cases cited by Bowers and the United States have concluded, explicitly or implicitly, to the contrary. *See, e.g., Tatum v. National Collegiate Athletic Ass'n*, 992 F.Supp. 1114, 1119 (E.D.Mo.1998) (applying Title III to NCAA and citing *National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988)); *Ganden*, 1996 WL 680000 at *7–11 (applying Title III to NCAA); *Butler v. National Collegiate Athletic Ass'n*, No. C96–1656D, slip op. at 3–8 & n. 4 (W.D.Wash. Nov. 8, 1996) (concluding that NCAA is not subject to Title II); *see also* Department of Justice, *The Americans with Disabilities Act, Title III Technical Assistance Manual* § III–1.7000 at 7–8 (dated Nov. 1993 & App. 1994) (hereinafter *DOJ–TAM* ) (noting relationship between Titles II and III and, *inter alia*, that "[a]s a public entity, [a city] cannot be subject to title III, even though its tenants are public accommodations that are covered by title III").

Finally, it is not impossible for some of the public accommodations allegedly operated by the NCAA to be owned or also operated by public entities. Mere joint operation of a public accommodation with a public entity does not exempt a certain physical space from coverage. *See, e.g., Ganden*, 1996 WL 680000 at *11; *Dennin v. Connecticut Interscholastic Athletic Conference, Inc.*, 913 F.Supp. 663, 670–71 (D.Conn.1996), *vacated on other grounds*, 94 F.3d 96 (2d Cir.1996); *DOJ–TAM* at 7–8. *But see Sandison v.*

*Michigan High School Athletic Ass'n, Inc.,* 64 F.3d 1026, 1036 (6th Cir.1995); *Johannesen v. National Collegiate Athletic Ass'n,* No. Civ. 96–197 PHX ROS, slip op. at 7 (D.Ariz. May 3, 1996).

### 1. Title II Claim as Against Iowa

■ In order to state a claim under Title II, Bowers must allege that: 1) he is a qualified individual; 2) with a disability; 3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; 4) by reason of his disability. *See, e.g., Dennin,* 913 F.Supp. at 670.

Iowa attacks Bowers' ADA claim on numerous prongs. On the "disability" prong, Iowa adopts the arguments of ACT and the Clearinghouse that Bowers is not disabled. *See* Iowa's Brief in Support of Motion to Dismiss 3–4 (dated Oct. 16, 1997) (hereinafter Iowa's Brief). Iowa also argues that playing intercollegiate football—Bowers' ultimate goal—is not a major life activity and that, therefore, Bowers cannot be disabled. *Id.* at 4. On the "qualified individual" prong, Iowa argues that Bowers is not a "qualified individual" within the meaning of section 12132 because the modification of the initial eligibility rules requested by Bowers would not be reasonable. Iowa also argues that Bowers was not qualified to play football at Iowa as evidenced by the fact that he was not given a football scholarship for reasons independent of his nonqualifier status. Iowa's arguments fail, and its motion to dismiss the ADA claim or, in the alternative, for summary judgment will be denied.

### a. Disability under the ADA

The ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2); *see, e.g., Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir.1996). For the purposes of both Titles II and III, the term "major life activities" "means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 28 C.F.R. §§ 35.104, 36.104.

■ Bowers has adequately alleged that he has a disability within the meaning of the ADA. *See, e.g.,* Amended Compl. at ¶¶ 4, 91–96 (alleging that, *inter alia,* Bowers was regarded as having a learning disability and that he has a record of having a learning disability); *id.* at ¶ 146 (alleging, *inter alia,* that Bowers has been identified as being perceptually impaired). Iowa adopts the arguments of ACT and the Clearinghouse that as a factual matter Bowers is not disabled because, *inter alia,* he has achieved a laudable level of success in his college courses at Temple. *See* ACT & Clearinghouse's Brief in Support of Motion 8–9 (dated Sept. 1997) (hereinafter ACT's Brief). The fact that Bowers may have completed a substantial amount of high school mathematics within a relatively short amount of time and that he may be doing well at Temple are simply not inconsistent, on the record before me, with his being disabled within the meaning of the ADA. Assuming, *arguendo,* that Bowers should be compared to the average unimpaired student, *see, e.g., Price v. National Bd. of Med. Examiners,* 966 F.Supp. 419, 426–27 (S.D.W.Va.1997), Iowa has not shown, sufficient to support a summary judgment motion, that Bowers is not impaired in his ability to learn as compared to the average student. The factual support adduced in support of that proposition, the two facts alluded to above, is at best flimsy.

Also, Iowa, and ACT and the Clearinghouse have not shown how Bowers' learning disability would manifest itself, in terms of his level of achievement as compared to an average student, *without regard to mitigating measures. See* 28 C.F.R. pt. 35, app. A at 470 (1997 ed.) ("[t]he question of whether a person has a disability should be assessed without regard to the availability of mitigating measures, such as reasonable modification or auxiliary aids and services"); *see also Matczak v. Frankford Candy & Chocolate Co.,* 136 F.3d 933, 937–38 (3d Cir.1997); *Arnold v. United Parcel Serv., Inc.,* 136 F.3d 854, 859–60 (1st Cir.1998). Accordingly,

viewing the facts in the light most favorable to Bowers, Iowa has not met the burden on summary judgment of showing that there is no genuine issue of material fact as to Bowers' disability within the meaning of the ADA and the applicable regulations.

As to Iowa's other argument that Bowers is not disabled, Iowa confuses two elements of a Title II claim. In particular, Iowa confuses the major life activities used to determine whether an individual is disabled—in this case, learning and the limitations thereupon—with the particular good, service, facility, privilege, advantage, or accommodation of which a plaintiff may be denied enjoyment—in this case, *inter alia,* the privilege of playing intercollegiate football. Unlike the plaintiff in *Knapp v. Northwestern Univ.,* 101 F.3d 473 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997), Bowers is not claiming a disability because of a limitation on his ability to play college sports. *See id.* at 479–82 (holding that student's heart condition did not constitute disability because student was only limited in playing intercollegiate sports which, by itself, is not a major life activity). Rather, Bowers alleges that: 1) he is limited in his capacity to learn; 2) therefore, he is disabled within the meaning of the ADA; and 3) he was denied the ability to participate in, among other things, intercollegiate football.

### b. By Reason of Such Disability

■ Iowa next argues that Bowers was not discriminated against "by reason of [his] disability" within the meaning of section 12132. This, Iowa asserts, is because Bowers was determined to be a nonqualifier as a result of his failure to satisfy the NCAA's core course requirements, not because of his disability. *See* Iowa's Brief at 4. Iowa appears, however, to rely exclusively on a legal conclusion I made after the preliminary injunction hearing, which, as I have already pointed out, *see* n. 3, *supra,* is not binding on the Court. Merely parroting the findings of fact or conclusions of law from my earlier opinion on the preliminary injunction motion, without pointing to any specific facts contained in the record before me, does not satisfy a party's burden on summary judgment. This is particularly true where, in

support of a motion for summary judgment, a party "*shall* furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue." Local Civil Rule 56.1 of the District of New Jersey (emphasis added). The requirements of Local Civil Rule 56.1 do not change because the Court has already denied a motion for a preliminary injunction. This failure to comply with the Local Civil Rule would by itself suffice to deny Iowa's motion for summary judgment.

But even if Iowa had properly supported its motion with a Rule 56.1 statement, there remain reasons for denying Iowa's motion for summary judgment. In denying Bowers' original motion for a preliminary injunction, I concluded that "Bowers failed to satisfy the initial eligibility requirements because he failed to meet the NCAA's core course requirement, not because of his learning disability." *Bowers I,* 974 F.Supp. at 467. This conclusion was predicated upon a finding that the core course requirement did not " 'screen out or tend to screen out' persons on the basis of their disability" because the NCAA provides for two methods by which students who have taken courses for the learning disabled may nonetheless meet the core course requirement. *Id.* at 465.

Iowa has not shown that these two methods—acceptance of a principal's certification that learning disabled courses are as demanding as "regular" core courses and a waiver procedure—sufficiently accommodate the learning disabled such that the NCAA's requirements as administered do not actually violate Title II's antidiscrimination principle. In the more penetrating light of fully-conducted discovery, it may very well be that these accommodations or modifications are insufficient.

For example, as counsel for the United States eloquently explained at oral argument, the timing of the waiver procedure may preclude it from being an acceptable modification or accommodation. The United States argued first that, if the waiver procedure may only be initiated after a student has already graduated from high school, then it may do little to help the learning disabled student because college recruiting will gener-

ally have been completed by that time. Second, the waiver procedure, even if successful from the student's perspective, may be completed so late that a student cannot involve himself or herself in fall collegiate athletic programs. *See* Trans. at 42–44; *see also* Trans. at 33, 38.

The same may also be true for the acceptance of a principal's certification about the nature of courses for learning disabled. For example, Bowers was not finally notified of his nonqualifier status until July 30, 1996, well after his high school graduation, *see* Amended Compl. at ¶ 133, and he may not have had any inkling of a problem with his high school transcript until late December, 1995, or early January, 1996. *See* Affidavit of Michael L. Bowers ¶¶ 10–13 (dated Nov. 3, 1997) (hereinafter Bowers Aff.). Also, an individual student may not have notice of NCAA policies sufficiently early in his or her high school career such that he or she can make affirmative efforts to improve his or her odds of being deemed a qualifier. *See* Amended Compl. at ¶ 118; Plaintiff's Brief at 21. Finally, without discovery as to the nature of the waiver procedure and its functioning, in general and specifically with respect to Bowers, it is impossible to ascertain whether the waiver procedure or the acceptance of principal certifications are meaningful accommodations or modifications. *See* Trans. at 33–40. The second predicate for my finding on the motion for a preliminary injunction that Bowers' disability was not the reason that Bowers' failed to satisfy the core course requirement was that what Bowers sought in his original Complaint and in his motion for a preliminary injunction was, in essence, an unreasonable accommodation or modification. *Bowers I*, 974 F.Supp. at 466. Summary judgment on this question, however, is not appropriate at this stage. Bowers has changed the nature of the proposed modification. Originally, Bowers had wanted the NCAA to accept all of his special education courses as core courses without regard to their level or content. *Id.* This, I held, was an unreasonable modification. In the First Amended Complaint, Bowers has requested as relief that courses which contain at least 75% or more of the academic content of "regular" courses be treated as

core courses, and that his SAT score be accepted. *Compare* Amended Compl. at p. 24–25 *with* Compl. at p. 20–21. Only after the parties have conducted discovery on the waiver procedure and the acceptance of principal certifications regarding course content and presented the finder of fact with a fully developed record can a determination of the reasonableness of the (newly) proposed modification be made.

### c. Qualified Individual with a Disability

■ Iowa also argues that Bowers is not an "otherwise qualified individual" because the accommodation requested is a complete waiver of the eligibility requirements, something which would effect a "fundamental alteration" of the nature of the NCAA's program for regulating student participation in intercollegiate athletics. *See* Iowa's Brief at 4–5 (quoting *School Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)). Although the terms "otherwise qualified individual" and "qualified individual with a disability," are very closely related, *see* 28 C.F.R. pt. 35, app. A at 472 (1997) (noting statutory derivation of "otherwise qualified individual"); *see also Sandison*, 64 F.3d at 1036; *Helen L. v. DiDario*, 46 F.3d 325, 330 & n. 1 (3d Cir. 1995) (noting relationship between Rehabilitation Act and ADA), *cert. denied*, 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995); *Medical Soc'y of N.J. v. Jacobs*, 1993 WL 413016, *6 (D.N.J. Oct.5, 1993); 42 U.S.C. § 12134(b) (prescribing that regulations issued under Title II shall be consistent with regulations issued under section 504 of Rehabilitation Act), I presume that Iowa in reality meant to argue that Bowers is not a "qualified individual with a disability" within the meaning of section 12131(2), since it is this term which appears in Title II.

The ADA defines "qualified individual with a disability," in relevant part, as:

an individual with a disability who, with or without reasonable modifications to rules, policies, or practices ... or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in

programs or activities provided by a public entity.

42 U.S.C. § 12131(2). Knowing that Bowers has avoided dismissal and summary judgment on the question of whether he has a disability within the meaning of section 12102, I must determine whether Iowa would be entitled to summary judgment on the question of whether Bowers is a "qualified individual." To do so, I evaluate Iowa's entitlement to summary judgment based upon two criteria: 1) whether the eligibility requirements imposed upon Bowers are essential; and 2) if so, whether Bowers meets these requirements with or without a modification. *See, e.g., Pottgen v. Missouri State High Sch. Activities Ass'n,* 40 F.3d 926, 930 (8th Cir.1994).

At the outset, I note that Iowa must shoulder the burden of showing that "the making of modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7), and the burden of showing that eligibility criteria which might otherwise "screen out or tend to screen out ... a class of individuals with disabilities" are "necessary for the provision of the service, program, or activity offered," 28 C.F.R. § 35.130(b)(8).

After a review of only the first of these questions—the necessity of the NCAA's initial eligibility standards—I find that there are substantial questions of fact which preclude the entry of summary judgment. First, it is not at all clear that the initial eligibility requirements are essential or necessary to the maintenance of intercollegiate athletics since the NCAA itself provides for the waiver of the initial eligibility standards at the request of a member-institution and now, the student. *See, e.g.,* NCAA Manual § 14.3.1.7. Additionally, Iowa has offered no evidence to show that waivers are so infrequently granted that the initial eligibility criteria cannot be deemed anything but essential. Nor has Iowa adduced any evidence suggesting that the NCAA so rarely accepts a high school principal's submission that students with learning disabilities are expected to acquire the same knowledge, both quantitatively and qualitatively, as students in other core courses that the non-acceptance of

courses for learning disabled students as core courses can be deemed, at this point, essential or necessary. *See* Amended Compl. at ¶ 126; *see also* NCAA Manual at § 14.3.1.3.5. Finally, Iowa has presented no evidence to show that the NCAA's standards could not be modified in such a way that the goals of the initial eligibility requirements could not be achieved without the use of the current initial eligibility criteria, for example, by implementing a more nuanced, individualized assessment of a disabled student's ability to manage the pressures of intercollegiate athletics and college academics rather than applying a purely numerical assessment of a high school student's academic record and standardized test scores. *See Bowers I,* 974 F.Supp. at 461 (noting that goals of initial eligibility requirements are "to assure proper emphasis on educational objectives, to promote competitive equity among institutions, and to prevent exploitation of student athletes"); *id.* at 466–67 (discussing *Ganden* ); *cf. Pottgen,* 40 F.3d at 929–30 (finding that no reasonable accommodation to age limit requirement existed and that therefore plaintiff was not qualified).

In its reply brief, Iowa advances for the first time another reason why Bowers was not qualified and that it is entitled to summary judgment for this reason. Specifically, Iowa argues that Iowa determined not to recruit Bowers long before the Clearinghouse determined that Bowers was a nonqualifier. *See* Affidavit of Frank J. Verducci ¶ 7 (dated Oct. 16, 1997) (hereinafter Verducci Aff.); *see also* Iowa's Reply to Plaintiff's Response 4–7 (dated Nov. 12, 1997) (hereinafter Iowa's Reply Brief). For example, Iowa claims that as early as October, 1995, Frank J. Verducci, an assistant football coach at Iowa, determined that Bowers was not someone to whom Iowa would offer a football scholarship, principally because of his weight. *See* Verducci Aff. at ¶ 4. Consistent with the argument that Bowers was eliminated as a potential football recruit well before the assignment of nonqualifier status, Verducci asserts that Bowers was not among the potential scholarship recipients who were invited to visit Iowa in December, 1995, and accordingly Bowers did not ever have his academic

record evaluated by Iowa's football coaching staff. *Id.* at ¶¶ 5–6.

Bowers has specifically responded to this affidavit with far more than a "mere scintilla" of evidence and his affidavit shows the existence of a question of fact as to when and why he was eliminated as a potential scholarship recipient. Bowers first asserts that he was informed that he would be given a scholarship by Iowa in August, 1995. *See* Bowers Aff. at ¶ 8; *see also* Amended Compl. at ¶ 73. Bowers also asserts that he was contacted on a weekly basis by Iowa's football program as late as December, 1995, and that in early December, Verducci told Bowers that a date would soon be set for an official campus visit by Bowers. *Id.* at ¶¶ 7, 10. Bowers asserts that in late December, 1995, or early January, 1996, Verducci told Bowers that he had not taken algebra and geometry and that therefore he fell below the Clearinghouse's standards. *See id.* at ¶ 11; *see also* Plaintiff's Preliminary Injunction Exh. 1a (noting that Bowers' high school transcript was sent to Iowa on October 6, 1995). Finally, Bowers claims that he and Verducci discussed the availability of scholarships should Bowers take algebra and geometry in the spring of his senior year, *id.* at ¶ 12, courses which Bowers did complete in his final months of high school. *See* Plaintiff's Preliminary Injunction Exh. 1a, 1h.

Bowers' affidavit creates a genuine issue of material fact as to when and why Bowers was eliminated as a potential football recruit: in October, 1995, as a result of his relatively low weight, *see* Verducci Aff. at ¶ 4; *or* in December, 1995, after Bowers had been informed that he would soon be invited for a campus recruiting visit and after his high school transcript would have been evaluated by Iowa's football coaching staff, *see* Bowers Aff. at ¶¶ 10–11; Verducci Aff. at ¶ 6. One reasonable inference, which must be drawn in Bowers' favor on a motion for summary judgment, is that Iowa eliminated Bowers from consideration as a potential football recruit because it considered his high school academic record inadequate in terms of the NCAA's initial eligibility rules. And it is reasonable to infer, based on the facts contained in Bowers' affidavit and on a motion for summary judgment, that Iowa considered Bowers' academic record inadequate, at least in part, because of the presence of numerous special education courses on his transcript and/or because of Iowa's expectation, after reviewing Bowers' academic record, that he would not be assigned qualifier status by the Clearinghouse. There is also a genuine issue of material fact as to whether Bowers was not offered an athletic scholarship by Iowa because of his learning disability or whether it was because Iowa did not think sufficiently of his prospects as a football player. Thus, genuine issues of material fact exist as to whether Bowers is a "qualified individual." Accordingly, Iowa is not entitled to summary judgment on the question of whether Bowers is a "qualified individual with a disability." [6]

## 2. Title III Claim as Against the NCAA, ACT, and the Clearinghouse

The NCAA, ACT, and the Clearinghouse have all moved to dismiss the ADA claim or, in the alternative, for summary judgment. I find that Bowers has not adequately alleged an ADA claim against ACT and the Clearinghouse because he does not allege that ACT and the Clearinghouse own, lease (or lease to), or operate a place of public accommodation. As such, the claim must be dismissed as to these defendants. As for the NCAA, I find that Bowers has adequately alleged that the NCAA owns, leases (or leases to), or operates the place of public accommodation

---

6. Iowa also originally moved to dismiss the ADA and the Rehabilitation Act claims arguing that both statutes are unconstitutional under both *City of Boerne v. Flores*, —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), and *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). *See* Iowa's Brief at 7–8; *see generally* 42 U.S.C. § 2000d–7(a)(1); *id.* at § 12202. To obviate the intervention of the United States under 28 U.S.C. § 2403(a), Iowa withdrew by letter that portion of its motion which raised the constitutional claims, preferring instead to raise those issues by way of an answer, if necessary. *See* Letter from Gordon E. Allen (dated Nov. 25, 1997); Letter from Gordon E. Allen (dated May 21, 1998). Bowers "agrees that it is appropriate for [Iowa] to withdraw its defense based on the unconstitutionality of the [ADA]." Letter from Barbara E. Ransom (dated Dec. 5, 1997). Purporting "to avoid misunderstanding," Bowers also "objects to [Iowa's] withdrawing its motion." *Id.*

and that he was denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of that place of public accommodation. I also find that there are genuine issues of material fact precluding summary judgment as to whether the NCAA owns, leases (or leases to), or operates the place of public accommodation of which Bowers was allegedly denied full and equal enjoyment and whether Bowers was discriminated against by the NCAA.

In order to state a claim under Title III of the ADA, Bowers must allege that: 1) he was discriminated against on the basis of disability; 2) in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation; 3) by any person who owns, leases (or leases to), or operates a place of public accommodation. *See, e.g., Shultz By and Through Shultz v. Hemet Youth Pony League*, 943 F.Supp. 1222, 1225 (C.D.Cal.1996); *Sharrow v. Bailey*, 910 F.Supp. 187 (M.D.Pa.1995); *Howe v. Hull*, 873 F.Supp. 72, 78 (N.D.Ohio 1994); *D.B.*, 896 F.Supp. at 170; *see also Fink v. Kitzman*, 881 F.Supp. 1347, 1373–74 (N.D.Iowa 1995) (discussing prima facie case under ADA).

#### a. ACT and the Clearinghouse

In order to be subject to Title III of the ADA, a potential defendant must be "[a] person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a); *see also* 28 C.F.R. pt. 36, app. B at 613 (noting that ADA "places the obligation not to discriminate on any person who owns, leases (or leases to), or operates a place of public accommodation"). The statutory language prohibits discrimination by certain persons and extends no further than to actions by those persons.

The question I must answer is: Does Bowers properly allege that ACT and the Clear-inghouse are such persons and, if so, are ACT and the Clearinghouse entitled to summary judgment on that question? [7] ACT and the Clearinghouse argue that Bowers cannot avoid a dismissal for failure to state a claim because ACT is not a public accommodation. *See* ACT's Brief at 6. I find that, taking the facts as alleged in the First Amended Complaint as true, Bowers fails to state a claim under the ADA against ACT and the Clearinghouse.

Of course, I must begin my analysis by examining the language of the statute itself. *See, e.g., Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990). The ADA defines "public accommodation" in the following fashion:

> The following private entities are considered public accommodations for purposes of [Title II], if the operations of such entities affect commerce—
>
> (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;
>
> (B) a restaurant, bar, or other establishment serving food or drink;
>
> (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;
>
> (D) an auditorium, convention center, lecture hall, or other place of public gathering;
>
> (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;
>
> (F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or law-

---

7. The question of whether a potential defendant is an owner, operator, lessor, or lessee of a place of public accommodation is conceptually distinct from the question of whether Bowers has alleged denial of "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). The latter question asks primarily whether there is a nexus between what an ADA plaintiff was denied and a place of public accommodation. *See, e.g., Ford v. Schering–Plough Corp.*, 1998 WL 258386, *12 (3d Cir. May 22, 1998); *Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006, 1011–12 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998).

yer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment; (G) a terminal, depot, or other station used for specified public transportation; (H) a museum, library, gallery, or other place of public display or collection; (I) a park, zoo, amusement park, or other place of recreation; (J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education; (K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and (L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12181(7). The term "place" as used in the statutory language "place of public accommodation" is not defined by the ADA. I am guided by the Department of Justice regulations, the promulgation of which was expressly authorized by the statute, to the extent those regulations are not arbitrary, capricious, or manifestly contrary to the statute. *See* 42 U.S.C. § 12186(b); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see, e.g., Deane v. Pocono Med. Ctr.,* 1998 WL 173100, *11 n. 4 (3d Cir. Apr.15, 1998) (*en banc*) (Becker, C.J.). The regulations slice the statutory language in a confusing fashion, *see* Part III.B.2.b.i, *infra,* but ultimately end up at the same place as the statute: only those who own, lease (or lease to), or operate a place of public accommodation are subject to Title III. *See, e.g.,* 28 C.F.R. pt. 36, app. B at 613.

The regulations also define the terms "public accommodation" and "place of public accommodation." A "public accommodation" is "a private entity that owns, leases, (or leases to) or operates a place of public accommodation," and a "place of public accommodation" is a "facility operated by a private entity whose operations affect commerce and fall within at least one of the ... categories [listed in 42 U.S.C. § 12181(7)(A–L) ]." 28 C.F.R. § 36.201. In turn, a facility is "all or

any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, structure, or equipment is located." *Id.*

Bowers does not allege in the First Amended Complaint that ACT or the Clearinghouse "owns, leases (or leases to), or operates a place of public accommodation." *See, e.g.,* Amended Compl. at ¶¶ 33–50, 97–98, 109, 115–16, 118, 122, 129, 133–34, 137, 150–63, 171, 211, 238, 242–43, 247–54.

Perhaps recognizing this fatal flaw, Bowers argues, albeit obliquely, that the "Clearinghouse is a joint venture of the NCAA and ACT," *see* Plaintiff's Brief at 9; *see also* Amended Compl. at ¶¶ 35–36, and ACT and the Clearinghouse are, therefore, somehow subject to Title III of the ADA. The language of the ADA does not support this extension of liability to those who merely contract with someone who ultimately may be subject to Title III. It is true that the ADA's prohibitions extend to discrimination "on the basis of a disability ... directly or through contractual, licensing, or other arrangements." 42 U.S.C. § 12182(b)(1)(A)(i) (emphasis added). This language does not, however, extend potential liability beyond that provided for in section 12182(a), *i.e.,* liability predicated upon owning, leasing (leasing to), or operating a place of public accommodation. Not only would such an interpretation render the statute internally contradictory—by making the "general prohibition[s]" in subsection 12182(b) far broader than the "general rule" of subsection 12182(a)—but such an interpretation would also contravene the language of section 12182(b)(1)(A)(iv). That subsection provides that those protected by section 12182(b) are "clients or customers of the *covered public accommodation that enters into the contractual, licensing, or other arrangement.*" 42 U.S.C. § 12182(b)(1)(A)(iv) (emphasis added); *see also* H.R. Rep. No. 101–485(II), at 101 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 384. Thus, Bowers is back exactly where he started: Unless ACT and the Clearinghouse are "covered public accommodation[s]" by virtue of owning, leasing (or leasing to), or

operating a place of public accommodation, and Bowers has not alleged that this is so, then ACT and the Clearinghouse are still not subject to Title III.

Bowers' other argument, advanced in an equally oblique fashion, is that ACT is covered by the ADA because it is "a national testing service that leases facilities to administer college achievement test [sic]." Plaintiff's Brief at 17; *see also* Trans. at 21–25. I note first that this "allegation" is not included in the First Amended Complaint. Much more fundamentally, however, Bowers' ADA claim as alleged in the First Amended Complaint has nothing at all to do with testing facilities and his enjoyment thereof. *See, e.g., id.* at 24–25, 28. The allegations of the First Amended Complaint do not suggest that he was denied the enjoyment of those (unspecified) testing facilities. Rather, Bowers' claim relates to the NCAA's initial eligibility requirements, ACT and the Clearinghouse's application thereof, and ultimately Bowers' enjoyment of, among other things, intercollegiate football. Thus, Bowers still does not allege that ACT and the Clearinghouse own, lease (or lease to), or operate a place of public accommodation in such a way that they could modify that place of public accommodation to grant Bowers the enjoyment he alleges he was denied. *See, e.g., Neff v. American Dairy Queen Corp.*, 58 F.3d 1063, 1066–67 (5th Cir.1995) (finding that only franchisor's control over franchisees which relates to the allegedly discriminatory conditions at franchisees' locations bears on franchisor's operation of place of public accommodation), *cert. denied*, 516 U.S. 1045, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996); *Cortez v. National Basketball Ass'n*, 960 F.Supp. 113, 116 (W.D.Tex.1997) (concluding that guidelines issued by NBA with respect to arenas did not relate to alleged discrimination and, therefore, that no operation of arenas within meaning of ADA could be implied from guidelines).

Stated another way, to the extent ACT actually does own, lease, or operate a place of public accommodation in connection with a national testing service, ACT and the Clearinghouse are subject to the ADA's anti-discrimination principles only in the operation of *that* place of public accommodation. Mere operation of one place of public accommodation does not by itself subject every other aspect of the operator's business to Title III.

This is abundantly clear from both the Department of Justice's regulations and commentary thereon, as well as case law:

> Section 36.102(b)(2) emphasizes that the general and specific public accommodations requirements of subparts B and C obligate a public accommodation only with respect to the operations of a place of public accommodation. This distinction is drawn in recognition of the fact that private entity that meets the regulatory definition of public accommodation could also own, lease or lease to, operate facilities that are not places of public accommodation. The rule would exceed the reach of the ADA if it were to apply the public accommodation requirements of subparts B and C to the operations of a private entity that do not involve a place of public accommodation.

28 C.F.R. pt. 36, app. B at 607.

> Of course, a company that operates a place of public accommodation is subject to this part [28 C.F.R. pt. 36] only in the operation of *that* place of public accommodation. [For example], the wholesale produce company that operates a road side stand would be a public accommodation *only for the purposes of the operation of that stand.*

*Id.* at 614 (emphasis added); *see, e.g., Parker*, 121 F.3d at 1010–12 (operator of insurance office would be subject to Title III only where disability policy was obtained through place of public accommodation); *Leonard F. v. Israel Discount Bank of New York*, 967 F.Supp. 802, 804 (S.D.N.Y.1997) (bank office was place of public accommodation, but plaintiff did not claim denial of services in connection with operation of that place of public accommodation).[8] Accordingly, because

---

8. Because I will dismiss Bowers' ADA claim against ACT and the Clearinghouse for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) and not on summary judgment pursuant to Rule 56, I need not evaluate the effect, if any, of Bowers' claims at oral argument about discovery with respect to ACT and the Clearinghouse. *See, e.g.,* Trans. at 21–25

Bowers has not alleged sufficient facts to subject ACT and the Clearinghouse to liability under Title III of the ADA, the ADA claim as alleged against ACT and the Clearinghouse will be dismissed.

### b. The NCAA

The NCAA argues that Bowers' ADA claim fails for three reasons. First, it argues that it is not a place of public accommodation and that it does not own, lease, or operate a place of public accommodation. Second, the NCAA argues that Bowers has not alleged that he was denied access to a place of public accommodation. Finally, the NCAA argues that it does not discriminate against the learning disabled. *See* NCAA's Brief at 7–15. These arguments in support of the motion to dismiss and, when matters outside the pleadings are considered, in support of the motion for summary judgment, are without merit.

### i. Place of Public Accommodation

With respect to the first argument—that the NCAA itself is not a place of public accommodation—the Third Circuit has recently held, and quite rightly, that a public accommodation within the meaning of 42 U.S.C. § 12181(7) is a physical place. *Schering-Plough Corp.*, 1998 WL 258386 at *12–13 (rejecting analysis of *Carparts Distribution Ctr., Inc. v. Automotive Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12 (1st Cir.1994), and endorsing approach of *Parker*, 121 F.3d 1006); *see also Erwin v. Northwestern Mut. Life Ins. Co.*, 1998 WL 154627, *7–8 (S.D.Ind. Mar.17, 1998); *Leonard F.*, 967 F.Supp. at 804 ("[The *Carparts* ] opinion purports to find an ambiguity in the statute because one can avail oneself or herself [sic] of services . . . by telephone without entering the physical premises of the travel agent, and that Congress could not have intended an absurd result. . . . This decision . . . flies in the face of the plain meaning of Title III and is not supported by the legislative history."). Thus, the NCAA as an unincorporated association and voluntary membership organization is not and cannot be a public accommo-

dation within the meaning of section 12182(a). *Schering-Plough*, 1998 WL 258386 at *12–13. Nor, *a fortiori*, is the NCAA a place of public accommodation within the meaning of section 12182(a). *See, e.g., Stoutenborough v. National Football League*, 59 F.3d 580, 583 (6th Cir.1995) (football league, football clubs, and broadcasters were not subject to Title III in promulgation and enforcement of "blackout" rule which impacted hearing-impaired), *cert. denied*, 516 U.S. 1028, 116 S.Ct. 674, 133 L.Ed.2d 523 (1995); *Brown v. 1995 Tenet ParaAmerica Bicycle Challenge*, 959 F.Supp. 496 (N.D.Ill.1997) (organizer of bicycle race was not subject to Title III); *Elitt v. U.S.A. Hockey*, 922 F.Supp. 217, 223 (E.D.Mo.1996) (youth hockey league was not subject to Title III).

Even so, this proposition is besides the point for the purposes of section 12182(a). After all, Bowers does not really allege denial of the enjoyment of the NCAA, for example, denial of membership in the NCAA itself. Bowers simply does not want membership in the NCAA in the same way that the plaintiff in *Welsh v. Boy Scouts of America*, 993 F.2d 1267 (7th Cir.), *cert. denied*, 510 U.S. 1012, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993), wanted to be a member of the Boy Scouts. *See, e.g., Ganden*, 1996 WL 680000 at *10 (questioning applicability of *Welsh* to plaintiff's claim and noting that "*Welsh* considered whether a membership organization, itself, constituted a 'place of public accommodation,' and not whether it 'operated' such a place"); *Butler*, No. C96–1656D, slip op. at 7 (noting that *Welsh, inter alia*, dealt with membership organizations as organizations, not as operators of facilities that might, in turn, be considered places of public accommodation).

As I have repeatedly stated, the critical question for liability under section 12182 is whether the NCAA owns, leases (or leases to), or operates a place of public accommodation. On the face of the section 12182(a), this appears to be relatively straight-forward. Nonetheless, there appears to be some confu-

(claiming need for discovery on such issues as: whether ACT was an agent of or a contractor with the NCAA; how exactly the Clearinghouse evaluates student transcripts; whether students

who take a certain standardized test administered by ACT and students who take the SAT are evaluated similarly by the Clearinghouse).

sion about the appropriate question to ask in determining whether a defendant is subject to liability under section 12182(a). I can discern three reasons why this issue has remained somewhat murky.

The first source of confusion stems from the theory that a non-physical space could be a public accommodation within the meaning of section 12182. *See, e.g., Ganden,* 1996 WL 680000 at *10 (plaintiff alleged that NCAA was place of public accommodation and that it operated a place of public accommodation); *Tatum,* 992 F.Supp. at 1119 ("For [Title III] of the ADA to apply to the NCAA, it must be properly classified either as a place of public accommodation or an operator of a place of public accommodation"); *cf. Anderson v. Little League Baseball, Inc.,* 794 F.Supp. 342, 344 (D.Ariz.1992) (plaintiff alleged that Little League Baseball and its games were public accommodation and that Little League Baseball owned, operated, or leased place of public accommodation). At least after *Schering–Plough,* this theory has now been repudiated in this Circuit.

As a second source of confusion, it may well be that the regulations promulgated by the Department of Justice have generated the slightly off-center inquiry undertaken by some. While they do not contradict the statutory language, the regulations are unhelpfully self-referential and create terms which are confusingly similar to, but do not exactly correlate with, the statutory language. For example, the statute prevents discrimination by "any person who owns, leases (leases to), or operates a place of public accommodation." *See* 42 U.S.C. § 12182(a). The statute in turn defines public accommodation by listing twelve categories of physical spaces. *See id.* at § 12181(7). This is clear enough.

The regulations, for some inexplicable reason, define "public accommodation" as "the private entity that owns, leases (or leases to), or operates a place of public accommodation." *See* 28 C.F.R. § 36.104 (emphasis added). Adding further unnecessary regulatory mud to the clear statutory water, the regulations then go on to define "place of public accommodation" as a "facility, operated by a private entity ... whose operations fall within at least one of the following cate-

gories [listed in 42 U.S.C. § 12181(7), which define public accommodation]." *Id.* The commentary to the regulations appears to recognize this gratuitously cryptic system by distinguishing between definitions for the purposes of the statute and definitions for the purposes of the regulation. *See* 28 C.F.R. pt. 36, app. B at 613 (concluding that "placing the obligation not to discriminate on the public accommodation, as defined in the rule, is consistent with [the relevant statute] which places the obligation on any person who owns, leases (or leases to), or operates a place of public accommodation"). Accordingly, in statutory terms, the mountaintop question for determining whether a private entity is subject to section 12182(a) is: Is the defendant a person who owns, leases (leases to), or operates a place of public accommodation? *See, e.g., Butler,* No. C96–1656D, slip op. at 8. In regulatory terms, the question is: Is the defendant a public accommodation? Throughout this opinion, of course, I have articulated this question in terms of the statute.

As a final source of opacity, some courts have looked to Title II of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a(a) *et seq.,* in determining who may be a potential defendant in an Title III case under the ADA. *See, e.g., Elitt,* 922 F.Supp. at 223. It is true that section 12182(a), like section 2000a, prevents discrimination in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation. Unlike section 2000a(a), however, section 12182(a) more explicitly limits who can be a potential defendant by including the language "by any person who owns, leases (leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a); *see, e.g., Neff,* 58 F.3d at 1070 ("[B]ecause the Civil Rights Act does not define the scope of defendants who may potentially be liable with reference to who 'operates' a public accommodation, Civil Rights Act cases are unlikely to be informative on the meaning of that term."). Accordingly, it is the all-important question of whether the NCAA owns, leases (or leases to), or operates a place of public accommodation to which I now turn.

### ii. Operates a Place of Public Accommodation and Enjoyment of a Place of Public Accommodation

Neither the ADA nor the regulations define "operates" as used in the phrase "operates a place of public accommodation." 42 U.S.C. § 12182(a). The various cases in which courts have specifically addressed this question appear to fall loosely into three categories: 1) cases where courts considered whether an individual could be liable under the ADA; 2) cases involving the franchisor-franchisee relationship; and 3) cases involving organizations which sponsor or otherwise set the standards for events taking place at facilities owned by others.

In the individual liability cases, courts have generally been faced with the question of whether an individual, often an employee of the owner of a place of public accommodation, could be subjected to liability under section 12182(a). In *Doe v. Montgomery Hosp.*, 1996 WL 745524 (E.D.Pa. Dec.23, 1996), the court considered whether a nurse and physician's assistant could be deemed "operators" of a local hospital which allegedly discriminated against an HIV-positive patient. The court held that these two employees were not operators of the hospital, the relevant place of public accommodation, within the meaning of section 12182(a) because they were not in positions of authority with respect to the hospital, could not control the hospital's actions, and could not make binding decisions or policy on behalf of the hospital. *Id.* at *5–6 (discussing test set forth in *Howe*, 873 F.Supp. at 77, which held that a physician who had sole discretion to determine whether patient was admitted to hospital was operator of hospital within meaning of ADA); *see also Guckenberger v. Boston Univ.*, 957 F.Supp. 306, 322–23 (D.Mass.1997) (plaintiff stated ADA claim against former president of university as operator of university within meaning of ADA, but not against assistant to president). *But see Simenson v. Hoffman*, 1995 WL 631804, *4–5 (N.D.Ill. Oct.24, 1995) (holding that individual may never be operator within meaning of section 12182(a) and discussing *EEOC v. AIC Sec. Investigations, Inc.*, 55 F.3d 1276 (7th Cir. 1995)).

The leading case in the franchisor-franchisee context, *Neff v. American Dairy Queen Corp.*, 58 F.3d 1063, decided the question of whether a franchisor could be the operator of a franchisee's restaurant, and sharpens the focus of the individual liability cases. The *Neff* court's analysis of the meaning of "operates" focuses on whether the alleged operator can control the allegedly discriminatory conditions of the public accommodation. *Id.* at 1066. Thus, while the franchisor controlled the use of trademarks and uniforms at the franchisee's location, the franchisor did not control whether the physical plant of the franchisee's restaurant was more accessible to the disabled plaintiff. *Id.* at 1067 ("the relevant question is whether [franchisor] controls modification of the [individual stores] to cause them to comply with the ADA"); *see also* H.R. Rep. No. 101–485(III), at 56 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 479 ("if the corporate headquarters for a chain of restaurants designs all new restaurants to contain barriers to access, an injunction could be brought against the corporation"). In order to make this determination, the *Neff* court looked in detail at the relationship between the franchisor and franchisee, including the contract which partially set forth that relationship. *See id.* at 1067–69.

The United States, as *amicus curiae*, argues that *Neff* was wrongly decided, claiming that its construction of the term "operate" is too narrow. *See* Brief of the United States 18 n. 11 (dated Nov. 4, 1997) (hereinafter Amicus Brief). I fail to see how *Neff* and *Cortez*, which applies *Neff*, are wrong in requiring that operation of a place of public accommodation be in connection with or related to the allegedly discriminatory conditions. *See Cortez*, 960 F.Supp. at 116. To say the least, it would be odd to saddle someone with liability for a certain discriminatory condition at a public accommodation when it is not that person who manages, controls, or regulates the public accommodation for the purpose of that particular condition. If the contrary were the rule, then it is not clear what relief could be obtained from someone who has no power to effect a remedy for the violation. Finally, both the legislative history of the ADA and the regulations

make clear that management, control, and regulation of a place of public accommodation may be allocable between parties. *See, e.g.,* 28 C.F.R. § 36.201(b); H.R. Rep. No. 101–485(III), at 55–56, *reprinted in* 1990 U.S.C.C.A.N. at 478–79.

In several cases involving organizations which sponsor or set the standards for activities or events taking place at places of public accommodation owned by others, including some cases which have involved the NCAA as a defendant, courts, often applying *Neff,* have considered whether these organizations can operate a place of public accommodation. For example, in *Cortez v. National Basketball Ass'n,* 960 F.Supp. 113, the court considered whether the NBA operated an arena in issuing guidelines for what facilities NBA arenas must provide. *Id.* at 115–17. While the NBA's guidelines for arenas were extensive, they did not concern any of the aspects of the arenas to which the hearing-impaired plaintiffs wanted modifications. *Id.* at 116.

Other courts which have been presented with these issues have applied *Neff* in somewhat distinct fashions. Several have concluded that sponsoring or standard-setting organizations, including the NCAA, can operate a place of public accommodation within the meaning of section 12182(a). *See, e.g., Tatum,* 992 F.Supp. at 1121 (in considering preliminary injunction, court found that NCAA exerted significant degree of control over athletic facilities of member-institutions and was therefore an operator); *Dennin,* 913 F.Supp. at 670 (in issuing preliminary injunction, facts that members of athletic conference delegated control and authority to conference to regulate athletic component of education, and that athletic conference sponsored, managed, and controlled athletic competitions and tournaments supported conclusions that athletic conference operated places of public accommodation and was subject to ADA); *Ganden,* 1996 WL 680000 at *10–11 (holding, in preliminary injunction context, that NCAA determined student's ability to participate in competitions as well as managed other aspects of competitions, and was therefore operator of place of public accommodation).

In light of these standards, I must determine whether Bowers has adequately alleged that the NCAA "operates," that is, manages, controls, or regulates the place or places of public accommodation of which Bowers was allegedly denied enjoyment in such a way that the NCAA manages, controls, or regulates the allegedly discriminatory conditions of that place or those places of public accommodation. If so, is the NCAA entitled to summary judgment on this question?

Bowers' factual allegations are sufficient to allege "operation" under this test. In particular, Bowers has alleged:

> This case involves the [NCAA's] creation and enforcement of discriminatory principles and requirements that caused ... ACT through efforts expended by one of its divisions, [the Clearinghouse] to designate ... Bowers, a student classified as having a learning disability, as a [nonqualifier]. This [nonqualifier] designation resulted in Bowers being denied access to intercollegiate athletics at Division I and Division II member schools and from receiving a full athletic scholarship solely on the basis of disability.

Amended Compl. at ¶ 1.

> The NCAA exercises substantial control over the operations of the sports facilities used in intercollegiate athletics. This operational control includes such matters as the selection of sites and dates for sports events, size of fields, ticket and seating arrangements, use of dining facilities; campus housing and room and board; use of athletic facilities; playing rules in athletic facilities....

*Id.* at ¶ 18.

> The NCAA establishes the initial eligibility standards for student athlete prospects for all NCAA member-schools. The absence of initial eligibility status prevents students athletes [sic] from participating in intercollegiate sports program and from receiving athletic scholarships at Division I and Division II schools.

*Id.* at ¶ 25.

> [The] NCAA requires that students be certified as a "qualifier" by ACT's ... Clearinghouse in order to participate fully in

intercollegiate athletics at a Division I or Division II member school

*Id.* at ¶ 97.

Under NCAA rules, [Bowers] as a [non-qualifier] is ineligible to compete in intercollegiate football, practice or condition with "qualifiers," or receive any athletic scholarship monies.

*Id.* at ¶ 135.

When Plaintiff enrolled in the Spring semester, the Assistant Coach of Temple's football program notified him that as a [nonqualifier] he could participate in physical training separate and apart from team members, and that he could not engage in any team activities and would not be eligible for "qualifier" status until the 1998–99 school year, approximately two years after his registration.

*Id.* at ¶ 142.

[Temple, Iowa, and AIC] are places of public accommodation with the meaning of Title III of the ADA, which reaches "secondary, undergraduate, or postgraduate private school[s]" and the "gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation" of such places of public accommodation. . . .

*Id.* at ¶ 151.

[The] NCAA "operates" and "leases" places of public accommodation and exercises control over the operations of the nation's colleges and universities such that it fulfills the "operates public accommodations" requirement of Title III.

*Id.* at ¶ 153.

[The] NCAA enters into agreements with public entities and [member-institutions] that would constitute "leasing" the facility, thus satisfying not only the "operates" but the "leases" provision of the "public accommodations" section of Title III.

*Id.* at ¶ 155.

These factual assertions adequately allege that the NCAA at least operates the place or places of public accommodation of which Bowers was allegedly denied enjoyment in such a way that the NCAA manages, regulates, or controls discriminatory conditions of that place or those places of public accommo-

dation. In particular, Bowers alleges, and under a set of facts consistent with the First Amended Complaint it could be shown, that the NCAA operates such places of public accommodation as team training, dining, living, playing, practice, and meeting facilities, and colleges and universities more generally. Bowers also alleges, and under a set of facts consistent with the First Amended Complaint it could be shown, that the NCAA operates these places of public accommodation in such a way that it manages, regulates, or controls the allegedly discriminatory conditions of these places.

In particular, Bowers alleges that a student's initial eligibility status, which is assigned strictly according to criteria promulgated by the NCAA, determines, for example, whether and how much financial aid a student-athlete may receive from a college or university, and whether and to what extent a student-athlete may practice, train, dine, live, and compete with a particular team. All of these are within the broad swath carved out by "goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation." 42 U.S.C. § 12182(a).

While at times the First Amended Complaint is framed in terms of the NCAA's control over, and Bowers' enjoyment of, something as ethereal as "intercollegiate athletics," Amended Complaint at ¶ 1; *see also id.* at ¶¶ 25, 135, there is a clear and sufficient nexus between what Bowers alleges he was denied and various public accommodations. That is, what Bowers alleges he was denied is most certainly "*of* a place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added); *compare, e.g., Schering–Plough*, 1998 WL 258386 at *12 (plaintiff received disability benefit through employer, and "had no nexus to [Defendant's] 'insurance office' and thus was not discriminated against in connection with public accommodation"); *Parker*, 121 F.3d at 1011 (holding that, where plaintiff sought certain disability insurance through her employer, plaintiff "did not seek the goods and services of a public accommodation" and "the good that plaintiff seeks is not offered by a place of public accommodation"); *Stoutenborough*, 59

F.3d at 583 (service which hearing-impaired plaintiffs wanted, televised broadcast of "blacked-out" home football games did not involve place of public accommodation); *Brown,* 959 F.Supp. at 499 ("chance to participate in [bicycle race] has no connection to a place of public accommodation ... [because it] took place on public roads which are not places of public accommodation"); *cf. Martin v. PGA Tour, Inc.,* 984 F.Supp. 1320, 1998 WL 54998 (D.Or. Jan.30, 1998) (finding that sponsor of professional golf events operated place of public accommodation). The First Amended Complaint is more than sufficient to satisfy the standard explicated above.

Before turning to the question of whether the NCAA is entitled to summary judgment on the question of whether it operates a place of public accommodation within the meaning of section 12182(a), I note that the NCAA has generally framed its argument in support of dismissal of Bowers' ADA claim in terms of whether Bowers has alleged that he was denied "access" to a place of public accommodation. *See* NCAA's Brief at 11–13. This is not a particularly helpful mode of inquiry since the term "access" is nowhere to be found in section 12182(a), section 12182(b)(1), or section 12182(b)(2)(A). Nor was Congress solely concerned with physical access when it passed the ADA. *See, e.g.,* H.R. Rep. No. 101–485(II), at 36, *reprinted in* 1990 U.S.C.C.A.N. 303, 318 (identifying various areas of discrimination). If the denial of physical access were the only thing with which Congress were concerned, then it would have not gone much further than passage of section 12182(b)(2)(iv) which relates generally to architectural barriers. Furthermore, it is unhelpful to introduce concepts which are not present in a statute or its legislative history into the analysis. *See, e.g., H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 240–41, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

As I have already said, it is not the denial of "access," whatever that might mean, which must be alleged, but rather the denial of "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). This understanding of the term "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation" is in no way inconsistent with *Schering–Plough.* That case held that the term "place of public accommodation," 42 U.S.C. § 12181(7), refers to places with resources utilized by physical access. *Schering–Plough,* 1998 WL 258386 at *14. Who is doing the denying must be the owner, operator, lessor, or lessee of a physical place. And what is denied must be "of" a physical place. *Id.* at *12 (requiring "nexus" between what places of public accommodation provide and place of public accommodation); *Parker,* 121 F.3d at 1011. But the ADA prohibits far more than just a denial of physical access.

In response to the factual allegations of the First Amended Complaint, the NCAA argues that it is entitled to summary judgment on the question of "operation." Its main argument is that the NCAA's Bylaws provide that member-institutions maintain control of their intercollegiate athletic programs such that the NCAA cannot be an operator of places of public accommodation within the meaning of section 12182(a). In particular, the NCAA cites its Bylaws which provide:

*Responsibility for Control.* It is the responsibility of each member-institution to control its intercollegiate athletics program in compliance with the rules and regulations of the Association. The institution's chief executive officer is responsible for the administration of all aspects of the athletics program, including approval of the budget and audit of all expenditures.

NCAA Manual at § 2.1.1 (emphasis in original).

This argument obscures more than it reveals. The very language of this and other provisions of the NCAA's Bylaws show that indeed it is quite possible for the NCAA to operate places of public accommodation in connection with the discriminatory conditions alleged by Bowers. Accordingly, the NCAA's motion for summary judgment on the ADA claim will be denied. First, the provision cited above requires NCAA mem-

ber-institutions to control their athletics programs "in compliance with the rules and regulations of the Association." *Id.; see also id.* at § 1.2(f) (listing, among purposes of NCAA, "to supervise the conduct of, and to establish eligibility standards for, regional and national athletics events under the auspices of [the NCAA]"). Thus, it is quite clear that the goal of member-institution self-control is, at least in part, strict compliance with the NCAA's rules. Furthermore, even in providing for institutional control, the NCAA governs in a relatively detailed fashion exactly how institutions are to control themselves. *See, e.g., id.* at § 6 (requiring faculty athletics representative, student-athlete advisory committee, annual financial audit, periodic self-study and evaluation in prescribed form, exit interviews of student-athletes). Third, the NCAA provides for an intricate procedure for the investigation and punishment of violations of its rules, compliance with which is phrased in mandatory terms. *See, e.g., id.* at § 2.7.1 ("[E]ach institution shall comply with all applicable rules and regulations of the [NCAA] in the conduct of its intercollegiate athletics programs."); *id.* at §§ 19, 32 (setting forth goals of and procedures for enforcement of NCAA rules). In light of these procedures and depending, to some extent, on the level of compliance engendered by NCAA-imposed sanctions, it is impossible to conclude on the summary judgment record before me that "the NCAA does not so much control its members, as its members control

the NCAA," NCAA's Brief at 11, even if membership in the NCAA is voluntary. For example, if NCAA initial eligibility rules determine when a student can receive an athletic scholarship, even if it is the member-institution which ultimately chooses whether to comply with NCAA rules and which funds the scholarship, the extent of NCAA regulation and the force of a threatened sanction may, to a fact-finder, constitute operation under the ADA.[9]

A review of the NCAA's other regulations confirms that it cannot be said, on the summary judgment record before me, that the NCAA does not both operate places of public accommodation, *and* manage, regulate, or control the allegedly discriminatory conditions at those places of public accommodation. The NCAA's initial eligibility requirements determine whether and to what extent a particular student can participate in intercollegiate athletics and can receive institutional financial aid. *See, e.g.,* NCAA Manual at § 14.3.2 to 14.3.3. And participation in intercollegiate athletics and receipt of financial aid from a member-institution are really just shorthand for a set of goods, services, facilities, privileges, advantages, or accommodations of specific places of public accommodation, such as undergraduate schools generally, food service establishments, stadia or other places of exhibition, gymnasia or other places of exercise or recreation, all of which the NCAA's regulations clearly treat.

---

**9.** In arguing that its bylaw regarding "institutional control" precludes a finding that the NCAA operates a place of public accommodation within the meaning of section 12182(a), the NCAA relies heavily on language from *Tarkanian. See* Reply Brief of the NCAA 12–13 (dated Oct. 22, 1997) (hereinafter NCAA's Reply Brief); Response of the NCAA to Amicus Curiae Brief 11 (dated Nov. 13, 1997) (hereinafter NCAA's Response to Amicus).

It is abundantly clear that the question of whether the NCAA is acting "under color of law" under 42 U.S.C. § 1983 when it imposes sanctions, *see Tarkanian,* 488 U.S. at 194–99, 109 S.Ct. 454, is different than the question of operation under section 12182(a). Not only is the statutory language of the two sections entirely different, but the two concepts are distinct. Considering any given action, an entity is either a state actor under section 1983 or it is not, whereas under section 12182(a) multiple parties may operate a place of public accommodation. *See,*

*e.g., Guckenberger,* 957 F.Supp. 306; *Montgomery Hosp.,* 1996 WL 745524; *Ganden,* 1996 WL 680000 at *11 ("parties may not escape the requirements of the ADA through multiple ownership or management of a facility"); *Howe,* 873 F.Supp. 72; *see also* 28 C.F.R. § 36.201(b); *DOJ–TAM* at 7–8 & 1994 App. at 3.

Furthermore, the language from *Tarkanian* quoted by the NCAA may not even be helpful to the NCAA on the question of "operation" under the ADA. If the NCAA's regulations over its member-institutions are so pervasive that "it would be more appropriate to conclude that [a state university] has conducted its athletic program under color of the policies adopted by the NCAA," *Tarkanian,* 488 U.S. at 199, 109 S.Ct. 454, then a fact-finder may find that under the ADA the NCAA operates the places of public accommodations at which these athletic programs occur. That is, to a fact-finder, NCAA regulation may become, at a certain point, operation under the ADA.

*See, e.g.,* NCAA Manual at Figure 14–6 (comparing qualifier, partial qualifier, and nonqualifier in terms of eligibility, per NCAA regulations, for various member-institution services, privileges, and advantages); *see also id.* at § 17.7 (regulating football practice and playing seasons); *id.* at § 16. Accordingly, for these reasons the NCAA's motion for summary judgment will be denied.

### iii. Discrimination under Title III

■ Finally, the NCAA claims that it does not discriminate against the learning disabled. For the same reasons that Iowa is not entitled to summary judgment on this question, *see* Part III.B.1, *supra,* the NCAA's motion will be denied. Like Iowa, the NCAA supported its motion for summary judgment by pointing to legal conclusions entered as part of the denial of Bowers' motion for a preliminary injunction. *See* NCAA's Brief at 13–15. Reliance upon my earlier legal conclusions entered after relatively little discovery had been conducted by the parties and after a preliminary injunction hearing, without specifying any particular fact, disputed or undisputed, and then hoping for the best, is insufficient to support a motion for summary judgment. It also bears repeating that, after a denial of a plaintiff's motion for a preliminary injunction, a defendant's burden on summary judgment is exactly as it would be absent a motion for preliminary injunction. The NCAA's suggestion that Bowers needs to "offer new evidence or explain why [the] Court should reconsider [its earlier] ruling" is erroneous. *See* NCAA's Reply Brief at 1–2.

Like Iowa, the NCAA also did not submit the material required by Local Civil Rule 56.1. Instead, the NCAA offered the following:

> However, if the Court would like to have before it a material statement of facts [sic], the NCAA would be happy to submit one.

NCAA's Response to Amicus at 25. Procedural rules which provide that a party *shall* affirmatively do something are in no sense voluntary. Nor do such rules require that the Court invite litigants to comply with the dictates of the rules. That said, the NCAA's motion will be denied for the same substantive reasons which require the denial of Iowa's motion for summary judgment. *See* Part III.B.1, *supra.*

### C. Rehabilitation Act (Count II)

Iowa, ACT and the Clearinghouse, and the NCAA have all moved to dismiss or, in the alternative, for summary judgment on Bowers' Rehabilitation Act claim. For the reasons set forth below, the motions will be denied.

■ Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), provides, in relevant part:

> No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). In order to state a claim under the Rehabilitation Act, Bowers must prove that: 1) he is disabled; 2) that he is "otherwise qualified" for the benefit sought or for participation in the program; 3) that he was excluded from participation in, denied the benefit of, or subject to discrimination "solely by reason of ... his disability;" and 4) that the program or activity receives federal financial assistance. *See, e.g., Knapp,* 101 F.3d at 478; *Sandison,* 64 F.3d at 1030–31 & n. 1; *Wagner by Wagner v. Fair Acres Geriatric Ctr.,* 49 F.3d 1002, 1009 (3d Cir. 1995); *Brown,* 959 F.Supp. at 499; *Dennin,* 913 F.Supp. at 667; *Sharrow,* 910 F.Supp. at 193.

#### 1. Disability under Section 794(a)

■ Iowa argues, just as it did with respect to the ADA claim, that Bowers is not disabled. For the same reason that Iowa was not entitled to summary judgment on the question of whether Bowers is disabled under the ADA, Iowa is not entitled to summary judgment on the question of whether Bowers is disabled under the Rehabilitation Act. *See, e.g., Kralik v. Durbin,* 130 F.3d 76,

78 (3d Cir.1997) (noting relationship between disability under ADA and Rehabilitation Act); *compare* 42 U.S.C. § 12102 *with* 29 U.S.C. § 706(8)(B).

## 2. Program or Activity

 The NCAA argues that it is not a "program or activity" within the meaning of 29 U.S.C. § 794(b), and therefore not subject to the Rehabilitation Act. That section defines "program or activity" as:

all of the operations of-

(1) (A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

(2) (A) a college, university, or other postsecondary institution, or a public system of higher education; or

(B) a local educational agency (as defined in section 8801 of Title 20) system of vocational education, or other school system;

(3) (A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship-

(i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

(ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

(4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

any part of which is extended Federal financial assistance.

29 U.S.C. § 794(b). The NCAA squarely fits within the statutory language of section 794(b)(4). The NCAA has described itself as "a voluntary unincorporated association of approximately 1,200 members, consisting of colleges and universities, conferences and associations and other educational institutions. Its active members are four-year colleges and universities located throughout the United States." *See* Affidavit of Frank E. Marshall ¶ 2 (dated Sept. 24, 1997). The NCAA is clearly established by two or more of the entities described in section 794(b)(1) through (3), in particular two or more colleges and universities. *See, e.g.,* NCAA Manual at §§ 3.2.1.1, 3.3.1.1.

The NCAA argues that the legislative history of section 794(b)(4) establishes that this subsection was intended to apply "only when the association had a public character." NCAA's Brief at 16. The legislative history cited by the NCAA does not, however, suggest that an association of, *inter alia,* colleges and universities, some of which are private and some public, was to be excluded from section 794(b)(4).

 I have already said that the language of 794(b)(4) is plain and unambiguous in its meaning. "While the Supreme Court has sometimes said that statutory interpretation should halt at such time as the court determines the text at issue to be plain and unambiguous, it has also indicated that the plain meaning rule ... does not preclude consideration of persuasive legislative history if it exists." *Smith v. Fidelity Consumer Discount Co.,* 898 F.2d 907, 910 (3d Cir.1990) (citations omitted). "Where statutory language is clear and plain, a court must give it effect unless the legislative history is such that a literal reading will produce a result demonstrably at odds with the intention of [the] drafters, or in other words, would thwart the obvious purposes of the ... [statute]." *Id.* at 910 (citation omitted and alterations in original); *see, e.g., Hartford Accident & Indem. Co. v. Sharp,* 87 F.3d 89, 91–92 (3d Cir.1996). In the case of the legislative history of section 794(b), the legislative history

supports the inclusion of the NCAA within section 794(b)(4).

I more fully reproduce the legislative history of section 794(b)(4) which was referred to by the NCAA. It states:

> *Example:* A school district and a corporation establish the PPP company—a public-private partnership whose purpose is to provide remediation, training and employment for high school students who are at risk of school failure. The PPP company applies for and is extended federal financial assistance. All of the operations of the PPP company would be covered even if the federal financial assistance was only to one division or component of the company.
>
> This is appropriate because an entity which is established by two or more of the entities described in (1), (2), or (3) is inevitably a public venture of some kind, i.e., either a government-private effort (1 and 3), a public education-business venture (2 and 3) or a wholly government effort (1 and 2). It cannot be a wholly private venture under which limited coverage is the general rule. The governmental or public character helps to determine institution-wide coverage. For example, in a Catholic diocese where 3 parishes receive federal aid, the parishes are geographically separate facilities which receive federal aid, and the diocese is a corporation or private organization of which the parishes are a part. Only the three parishes which receive federal aid are covered by the anti-discrimination laws. Both the parishes and the diocese are entities described in paragraph (3), therefore paragraph (4) would not apply.
>
> The governmental or public character of entities covered by paragraph (4) helps to determine institution-wide coverage. Even private corporations are covered in their entirety under (3) if they perform governmental functions, i.e., are "principally engaged in the business of providing education, health care, housing, social services, or parks and recreation."

S.Rep. No. 100–64 (1988), at 19, *reprinted in* 1988 U.S.C.C.A.N. 21. Besides the fact that the "wholly private venture" language is not a part of the statute, and thus should em-phatically not be elevated to that level of importance or turned into a mantra, the legislative history does nothing to suggest that an unincorporated association the members of which are public and private colleges and universities is "wholly private" and, therefore, should be exempt from the Rehabilitation Act.

Unlike the example of the three parishes and the diocese, not all of the members of the NCAA are private. Thus, the NCAA is much more like the PPP company described in the legislative history, an entity created by an instrumentality of the state and a private corporation, than it is like the diocese and its three parishes. Accordingly, not even the legislative history supports the NCAA's interpretation. The NCAA is a "program or activity" within the meaning of section 794(b), if any part is extended Federal financial assistance.

This finding is consistent with the holding of *Cureton v. National Collegiate Athletic Ass'n,* 1997 WL 634376 (E.D.Pa.1997). *Cureton* held without explanation that the NCAA was a "program or activity" within the meaning of 42 U.S.C. § 2000d–4a(4), a which contains language identical to section 794(b). *Id.* at *2. Furthermore, this finding is not inconsistent with my finding that the NCAA is not a "private entity", and thereby not subject to Title II of the ADA. *See* Part III.B, *supra.* Nor is this finding inconsistent with the Supreme Court's holding in *Tarkanian* that the NCAA did not act "under color of law" within the meaning of 42 U.S.C. § 1983 in establishing standards governing intercollegiate athletics. While it might be helpful, at least from the NCAA's perspective, if 29 U.S.C. § 794(b), 42 U.S.C. § 12131(1), and 42 U.S.C. § 1983 were in seamless alignment, the completely distinct statutory language in those three statutes, not to mention the utterly unrelated policy rationales behind each, forecloses such a result.

### 3. Federal Financial Assistance

Both ACT and the Clearinghouse, and the NCAA claim that they do not receive any federal financial assistance, and that all three are entitled to summary judgment on the

Rehabilitation Act claim. A recipient of federal funds is "any ... entity ... to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance." 34 C.F.R. § 104.3(f).

In support of its motion, ACT and the Clearinghouse aver that:

ACT is a non-profit educational organization based in Iowa City, Iowa.

. . . .

The Clearinghouse is an unincorporated operating department within ACT, staffed by ACT employees.

ACT receives no federal monies whatsoever in connection with its operations of the Clearinghouse.

In connection with its other activities and programs, ACT receives no grants or subsidies from the federal government, and no other type of "federal financial assistance." ACT is a party to 11 contracts with agencies of the federal government, but those contract are totally unrelated to, and in no way contribute or support, ACT's operation of the Clearinghouse.

Affidavit of Joseph B. Pugh ¶¶ 1, 3–5 (dated Sept. 24, 1997) (hereinafter Pugh Aff.). In response to this affidavit, Bowers claims, *inter alia,* that "further discovery is necessary on [the matter of ACT's contracts with the federal government] to ascertain the effect of these contracts on the program or activity provision of the Rehabilitation Act." Plaintiff's Brief at 14; *see also* Trans. at 54.

 ACT and the Clearinghouse are correct to assert that ordinarily contracts with the federal government are not considered "federal financial assistance" within the meaning of section 794(a). However, contracts which in actuality subsidize, as opposed to compensate, a recipient may result in the receipt of federal financial assistance within the meaning of section 794(a). *See, e.g., DeVargas v. Mason & Hanger–Silas*

*Mason Co., Inc.,* 911 F.2d 1377, 1382–83 (10th Cir.1990), *cert. denied,* 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991); *Muller v. Hotsy Corp.,* 917 F.Supp. 1389, 1417–18 (N.D.Iowa 1996); *Hamilton v. Illinois Central R.R. Co.,* 894 F.Supp. 1014, 1019–20 (S.D.Miss.1995). Bowers may learn more during discovery as to the nature of the contracts with the federal government and may reveal the existence of such subsidies. Because none of the issues specific to the Rehabilitation Act claim was litigated in connection with the preliminary injunction motion, it is reasonable that Bowers would not have had any informal or formal discovery on these issues. Accordingly, pursuant to Rule 56(f), the Court will deny ACT and the Clearinghouse's motion for summary judgment on the Rehabilitation Act claim. *Compare, e.g., Klick v. Hercules, Inc.,* 5 F.3d 546, 1993 WL 318833, *4 (10th Cir. Aug. 19, 1993) (where plaintiff had opportunity to conduct discovery, but failed to do so in timely manner, and where plaintiff did not identify with any specificity what facts with respect to receipt of federal financial assistance further discovery might reveal, denial of Rule 56(f) request was not abuse of discretion).[10]

 As to the NCAA's receipt of federal funds, the NCAA claims that an entity with which it is associated, the National Youth Sports Program Fund (the "NYSPF"), receives federal funds in connection with the National Youth Sports Program (the "NYSP"), but not the NCAA itself. In support of its motion for summary judgment, it has proffered substantial evidence of the separate nature of the NYSPF. *See, e.g.,* NCAA's Brief at 17–20; *see also Glover By and Through Glover v. Donnell,* 878 F.Supp. 898, 899 & n. 2 (S.D.Miss.1995).

In response, Bowers has come forward with evidence showing the existence of genuine issues of material fact as to whether the NCAA receives federal financial assistance through the NYSPF. For example, among the NCAA's many committees is the "National Youth Sports Program Committee,"

---

**10.** To the extent ACT and the Clearinghouse argue that ACT does not fit within the definition of section 794(b)(3)(A)(ii), *see* Reply Brief in Support of ACT's Motion 8 (dated Oct. 21, 1997) (hereinafter ACT's Reply Brief), Bowers has also properly supported a request under Rule 56(f). *See* Trans. at 28–30.

the responsibility of which is to "*administer* [ ] the National Youth Sports Program." *See* NCAA Manual at § 21.3.20 (emphasis added). Also, the Board of Directors of the NYSPF, a Missouri corporation, has its powers to some extent limited by the Council of the NCAA, the entity which directs the general policy of the NCAA during certain periods. *See* Plaintiff's Brief, Exh. 2 at 2, 14; NCAA Manual at § 4.1.3(a). Among the *ex officio* members of the Board of Directors of the NYSPF are the executive director of the NCAA and the chairperson of the NCAA's National Youth Sports Program Committee. *See* Plaintiff's Brief, Exh. 2 at 2. All of the members of the NYSPF's Board are either employees of the NCAA or members of the NCAA's National Youth Sports Program Committee. *See id.*, Exh. 10 at 51. The NYSPF also must report to the Council of the NCAA on an annual basis. *See id.* at 12. Furthermore, upon dissolution, the assets of the NYSPF "shall be distributed exclusively to the [NCAA]." *See id.*, Exh. 8 at ¶ 8. Finally, the executive director of the NCAA, speaking as such, has described the NYSP as "one of the NCAA's best-kept secrets," *id.* at Exh. 6, suggesting that the relationship between the NCAA and the NYSPF may not be as separate the NCAA claims in support of its motion. The NCAA's executive director continued:

> Our partnership with the federal government, local civil organization, and individual colleges and universities perfectly embodies the NCAA's team spirit. . . . The NCAA is proud of its 28 years of involvement with NYSP and looks forward to an equally successful future.

11. Because there are genuine questions of fact precluding summary judgment on the issue of whether the NCAA receives "federal financial assistance" within the meaning of section 794, I need not decide the propriety of Bowers' "indirect recipient" theory, *see* Trans. at 55–56; NCAA's Brief at 21–24; Amended Compl. at ¶¶ 15, 172. Nor do I need to decide the effect, if any of the Civil Rights Restoration Act of 1987, Pub.L. 100–259, 102 Stat. 28 (1988), on *United States Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986). *See, e.g., Smith,* 139 F.3d at 187–89; *A.D.E. Food Servs. Corp. v. City of Philadelphia,* 1996 WL 590906, *4 n. 4 (E.D.Pa. Oct.11, 1996); *Hodges v. Public Bldg. Comm'n of Chicago,* 873

*Id.; see also MIC Property & Cas. Ins. Corp. v. International Ins. Co.,* 990 F.2d 573, 575–76 (10th Cir.1993); Plaintiff's Exh. 11. These specific facts illustrate quite convincingly that there are genuine questions of material fact as to whether the NCAA receives federal funds through the NYSPF or whether the NCAA is intertwined with the NYSPF such that it cannot be considered separate. Accordingly, the motion for summary judgment on the issue of whether the NCAA receives "federal financial assistance" within the meaning of section 794 will be denied.[11]

### 4. Otherwise Qualified Individual and Discrimination Solely by Reason of Disability

▮ For the same reasons that summary judgment in favor of Iowa and the NCAA was inappropriate on the ADA claim, *see* Part III.B, *supra,* summary judgment on the issue of whether Bowers is an "otherwise qualified individual" within the meaning of section 794(a) and the issue of whether Bowers was discriminated against "solely by reason of . . . his disability" is inappropriate. Accordingly, the motions for summary judgment by the NCAA, and ACT and the Clearinghouse on Count II will be denied.

### D. New Jersey Law Against Discrimination (Count IV)

Bowers also alleges a cause of action as against the NCAA, ACT, and the Clearinghouse under the New Jersey Law Against Discrimination (the "NJLAD"), N.J.S.A. 10:5–1 *et seq.*[12] The NJLAD provides, in

F.Supp. 128, 130 (N.D.Ill.1995); *see also* Plaintiff's Brief at 13; NCAA's Brief at 21–24.

12. Iowa has not moved with respect to the NJLAD claim because it is apparently under the impression that the First Amended Complaint does not name Iowa as a defendant to the NJLAD claim. *See* Iowa's Brief at 9. This impression is quite reasonable. The paragraphs of the First Amended Complaint relating to the NJLAD do not mention Iowa by name and do so mention the NCAA, ACT, and the Clearinghouse. *See* Amended Compl. at ¶¶ 237–43. Plus, the relief requested is, *inter alia,* "compensatory and punitive damages as against NCAA, ACT, and the Clearinghouse." *See id.* at p. 38. Bowers appears to disagree. *See* Plaintiff's Response to

relevant part, that it shall be unlawful discrimination:

[f]or any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof, or directly or indirectly to publish, circulate, issue, display, post or mail any written or printed communication, notice, or advertisement to the effect that any of the accommodations, advantages, facilities, or privileges of any such place will be refused, withheld from, or denied to any person on account of the race, creed, color, national origin, ancestry, marital status, sex, affectional or sexual orientation or nationality of such person, or that the patronage or custom thereat of any person of any particular race, creed, color, national origin, ancestry, marital status, sex, affectional or sexual orientation or nationality is unwelcome, objectionable or not acceptable, desired or solicited, and the production of any such written or printed communication, notice or advertisement, purporting to relate to any such place and to be made by any owner, lessee, proprietor, superintendent or manager thereof, shall be presumptive evidence in any action that the same was authorized by such person

N.J.S.A. 10:5–12(f).

All of the provisions of the NJLAD apply to unlawful discrimination against "any person because such person is or has been at any time handicapped." N.J.S.A. 10:5–4.1; see also N.J.A.C. 13:13–4.2.[13] The statute also provides a private right of action. N.J.S.A. 10:5–13 ("any complainant may initiate suit ... under the act without first filing a complaint with the [Division on Civil Rights of the Department of Law and Public Safety] or any municipal office."); see also N.J.S.A. 10:5–5(h), 10:5–5.1, 10:5–6.

The NCAA, and ACT and the Clearinghouse have moved to dismiss the NJLAD claim arguing that none is a place of public accommodation. The NCAA also argues the Court's finding on the motion for a preliminary injunction that there was no discrimination under the ADA is sufficient to support a finding of no discrimination under the NJLAD. Finally, ACT and the Clearinghouse, relying exclusively on the findings of fact and conclusions of law entered in connection with the preliminary injunction, argue that the NJLAD was not violated. These arguments are without merit. The NCAA, ACT, and the Clearinghouse are all subject to the NJLAD, and it is altogether premature to hold that there was no violation of the NJLAD because genuine questions of material fact remain.

**1. Place of Public Accommodation under the NJLAD**

Similar to the ADA, the NJLAD prohibits discrimination by "any owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation." N.J.S.A. 10:5–12(f). A place of public accommodation includes, but is not limited to:

any tavern, roadhouse, hotel, motel, trailer camp, summer camp, day camp, or resort camp, whether for entertainment of transient guests or accommodation of those seeking health, recreation or rest; any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession dealing with goods or services of any kind; any restaurant, eating house, or place where food is sold for consumption on the premises; any place maintained for the sale of ice cream, ice

Iowa's Motion to Dismiss 8 (dated Nov. 3, 1997) (hereinafter Plaintiff's Response to Iowa' Motion) ("The First Amended Complaint states a cause of action against [Iowa] under ... the [NJLAD]."); see also id. at 10–11 (arguing that Iowa formed symbiotic relationship with the Clearinghouse). Nonetheless, the NJLAD claim as pled in the First Amended Complaint is not sufficient to put Iowa on notice that an NJLAD claim is being asserted against it. I do not express any view as

to whether a subsequent pleading by Bowers could state an NJLAD claim against Iowa under N.J.S.A. 10:5–5(l).

13. On the relationship between "handicapped" under N.J.S.A. 10:5–5(q) and "disability" under the ADA, see Failla v. City of Passaic, 1998 WL 272762, * 2–3 (3d Cir. May 29, 1998).

and fruit preparations or their derivatives, soda water or confections, or where any beverages of any kind are retailed for consumption on the premises; any garage, any public conveyance operated on land or water, or in the air, any stations and terminals thereof; any bathhouse, boardwalk, or seashore accommodation; any auditorium, meeting place, or hall; any theatre, motion-picture house, music hall, roof garden, skating rink, swimming pool, amusement and recreation park, fair, bowling alley, gymnasium, shooting gallery, billiard and pool parlor, or other place of amusement; any comfort station; any dispensary, clinic or hospital; any public library; any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey. Nothing herein contained shall be construed to include or to apply to any institution, bona fide club, or place of accommodation, which is in its nature distinctly private; nor shall anything herein contained apply to any educational facility operated or maintained by a bona fide religious or sectarian institution, and the right of a natural parent or one in loco parentis to direct the education and upbringing of a child under his control is hereby affirmed; nor shall anything herein contained be construed to bar any private secondary or post secondary school from using in good faith criteria other than race, creed, color, national origin, ancestry or affectional or sexual orientation in the admission of students.

N.J.S.A. 10:5–5(*l* ). As I have already pointed out, there is a substantial question of fact as to whether the NCAA operates places of public accommodation within the meaning of section 12182(a). For the same basic reasons, there is a substantial question of fact as to whether the NCAA is an "owner, lessee, proprietor, manager, superintendent, [or] agent . . . of any place of public accommodation" within the meaning of N.J.S.A. 10:5–12(f). Accordingly, the NCAA's motion to dismiss or for summary judgment on Bowers' NJLAD claim will be denied.[14]

 ACT and the Clearinghouse are subject to the NJLAD under, at the very least, N.J.S.A. 10:5–12(e). This provision substantially extends the reach of, *inter alia*, N.J.S.A. 10:5–12(f), by providing that it shall be unlawful discrimination:

> [f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so.

N.J.S.A. 10:5–12(e). *See, e.g., Failla*, 1998 WL 272762 at *4–8 (predicting that New Jersey Supreme Court would adopt a construction of civil aiding and abetting liability which focuses on knowing and actual provision of substantial assistance or encouragement, rather than shared intent); *see also Tyson v. CIGNA Corp.*, 918 F.Supp. 836 (D.N.J.1996), *aff'd*, 149 F.3d 1165 (3d Cir.); *Baliko v. Stecker*, 275 N.J.Super. 182, 645 A.2d 1218 (App.Div.1994).

Bowers adequately alleges that ACT and the Clearinghouse aided and abetted the NCAA. *See, e.g.*, Amended Compl. at ¶ 36 (alleging that ACT and Clearinghouse are agents for all Division I and II member-

---

**14.** Bowers also alleges that the NCAA and the Clearinghouse "share 'symbiotic' relationships with all [of] the NCAA Division I and Division II member-institutions for whom they supply an essential service: the determination of initial eligibility for student athlete prospects." Amended Compl. at ¶ 241; *see also id.* at ¶ 240 (alleging that Division I and Division II member-institutions located in New Jersey are places of public accommodation within the meaning of the NJLAD); *id.* at ¶ 243. Because there are more direct methods by which the NCAA may be subject to the NJLAD, the Court need not address at this point the propriety of Bowers' "symbiotic relationship" theory. *See, e.g., Frank v. Ivy Club*,

120 N.J. 73, 576 A.2d 241 (1990), *cert. denied*, 498 U.S. 1073, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991). Nor do I need to address any issues with respect whether the NCAA is itself a public accommodation under *Dale v. Boy Scouts of America*, 308 N.J.Super. 516, 706 A.2d 270 (App.Div. 1998), and what view the New Jersey Supreme Court may take on that issue. What *Ganden*, 1996 WL 680000 at *10, and *Butler*, No. C96–1656D, slip op. at 7, noted regarding *Welsh*'s relevance in considering potential NCAA liability under the ADA holds true for *Dale*'s relevance in considering potential NCAA liability under the NJLAD: Bowers does not want to be a member of the NCAA.

institutions); *id.* at ¶ 44 (alleging that Clearinghouse is responsible for determining eligibility of student-athletes); *id.* at ¶ 45 (alleging that Clearinghouse was established by the NCAA to enforce NCAA-promulgated requirements); *id.* at ¶ 47 (alleging that Clearinghouse was created to enforce initial eligibility requirements), 158 (alleging that contractual arrangements between, *inter alia,* NCAA, and ACT and/or Clearinghouse caused denial of equal treatment); *id.* at ¶ 244(b). Accordingly, ACT and the Clearinghouse's motion to dismiss or, in the alternative for summary judgment on the NJLAD claim will also be denied.

### 2. Liability under the NJLAD

■ Once again relying substantially or exclusively on my conclusions of law entered in connection with the denial of a preliminary injunction, the NCAA, and ACT and the Clearinghouse claim that Bowers' NJLAD claim fails. As I have already pointed out several times, such reliance on my earlier opinion, *see* ACT's Brief at 12; NCAA's Brief at 36–37, which was by its nature preliminary, is insufficient to support a motion for summary judgment. Additionally, there are factual questions as to whether ACT and the Clearinghouse determined Bowers' eligibility status reasonably. *See, e.g., Jansen v. Food Circus Supermarkets, Inc.,* 110 N.J. 363, 374, 541 A.2d 682 (discussing, *inter alia,* N.J.S.A. 10:5–2.1). That is, genuine issues of material fact remain as to whether the NCAA's initial eligibility standards impermissibly discriminate against the handicapped or whether they "discriminate on the basis of competence, performance, conduct or any other reasonable standards." N.J.S.A. 10:5–2.1. Accordingly, the motions of the NCAA, and ACT and the Clearinghouse's will be denied.

### E. Sherman Act (Count III)

■ Bowers also asserts a cause of action under the Sherman Act, 15 U.S.C. §§ 1 *et seq.* Bowers alleges that "[t]he NCAA and its members constitute a horizontal combination which sets limits on the business of intercollegiate athletics," *see* Amended Compl. at ¶ 199–204, and that, in short, the eligibility requirements set by the NCAA and its member-institutions are an unreasonable restraint of trade. *See id.* at ¶¶ 197, 206, 207, 211. The claim of an unreasonable restraint of trade is made with respect to all eligibility requirements, not merely the initial eligibility requirements, and is made with respect to all students, not merely learning disabled students. *See id.* at ¶¶ 197, 201; *see also id.* at ¶ 205 (noting "particularly severe impact" on learning disabled students).

Section 1 of the Sherman Act provides, in relevant part, that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

15 U.S.C. § 1. However, the Sherman Act does not apply to all activities of all organizations. *See Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.,* 128 F.3d 59, 63 (2d Cir.1997). The Sherman Act is aimed "primarily at combinations having *commercial* objectives and is applied to a very limited extent to organizations ... which normally have other objectives." *Smith v. National Collegiate Athletic Ass'n,* 139 F.3d 180, 185 (3d Cir.1998) (quoting *Klor's Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)) (emphasis added). In this vein, the Third Circuit has recently held that "eligibility rules are not related to the NCAA's commercial or business activities .... [and that] the Sherman Act does not apply to the NCAA's promulgation of eligibility requirements." *Id.* at 185–86. Accordingly, Bowers' claim—that the NCAA's eligibility rules are a violation of the Sherman Act—will be dismissed for failure to state a claim as to the NCAA, ACT and the Clearinghouse, and Iowa, all of whom have moved with respect to the antitrust claim. As a result of this dismissal, I need not address Defendants' other arguments as to why Bowers' antitrust claim should be dismissed or why Defendants are entitled to summary judgment on that claim.

■ The Sherman Act claim will also be dismissed for failure to state a claim as against Temple and AIC, despite the fact that neither has so moved. The Court may, *sua sponte,* dismiss a claim as to non-moving

defendants where the inadequacy of the claim is clear. *See Bryson v. Brand Insulations, Inc.*, 621 F.2d 556, 559 (3d Cir.1980); *see, e.g., Sullivan Assocs., Inc. v. Dellots, Inc.*, 1997 WL 778976, *7 (E.D.Pa. Dec.17, 1997); *Michaels v. New Jersey*, 955 F.Supp. 315, 331 (D.N.J.1996). In light of *Smith*, the Sherman Act claim is no more viable against Temple and AIC, both of which are members of the NCAA, as it is against the NCAA or Iowa.[15]

## F. Contract (Count V)

 Finally, Bowers alleges a breach of contract by ACT and the Clearinghouse. *See* Amended Compl. at ¶¶ 246–54.[16] In particular, Bowers alleges that his payment of the $18 fee in connection with his application to the Clearinghouse created under New Jersey law a contract between ACT and the Clearinghouse, and Bowers. *See id.* at ¶¶ 116, 247

& p. 38 (demanding remedies under New Jersey law). The contract, he alleges, provided that the Clearinghouse would determine Bowers' initial eligibility in accordance with the materials published by the NCAA and the Clearinghouse. *Id.* He also alleges that the Clearinghouse breached the contract by, *inter alia:* failing to provide Bowers or his high school with information sufficient to allow Bowers to comply with the NCAA's core course requirement; and failing to notify Bowers that his special education courses would not and could not be considered core courses without further action by the NCAA and without the submission of further information; failing to notify Bowers that he would require a waiver to meet the initial eligibility requirements or that a waiver procedure existed. *Id.* at ¶ 249. Bowers also alleges that ACT and the Clearinghouse acted in bad faith, and "unreasonably and arbi-

---

**15.** I have not reached the issue of whether Iowa and Temple are entitled to assert the defense of sovereign immunity on the antitrust claim. Indeed, this appears to be an issue over which there may be some disagreement. *Compare, e.g., Seminole Tribe*, 116 S.Ct. at 1131–32 n. 16 (Rehnquist, C.J.) ("contrary to the implication of Justice Stevens' conclusion, it has not been widely thought that the federal antitrust ... statutes abrogated the States' sovereign immunity") *with id.* at 1134 & n. 1 (Stevens, J., dissenting). Dismissing the Sherman Act claim as against Iowa and Temple for failure to state a claim without reaching the sovereign immunity question does not, however, offend the Supreme Court's recent pronouncements regarding jurisdiction in *Steel Co. v. Citizens for a Better Environment*, — U.S. —, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). In *Steel Co.*, the Court held that a federal court may not assume "hypothetical jurisdiction" for the purpose of deciding a case on the merits, but rather must first squarely address the question of subject matter jurisdiction. *Id.* at 1012–16. While the split among the Supreme Court suggests that this may not exactly be an unbending rule, *see, e.g., id.* at 1020 (O'Connor, J., concurring) (noting that decision "should not be read as cataloging an exhaustive list of circumstances under which federal courts may exercise judgment in 'reserving difficult questions of ... jurisdiction when the case alternatively could be resolved on the merits in favor of the same party' ") (citations omitted); *id.* at 1020–21 (Breyer, J., concurring in part and in the judgment) (deciding question of jurisdiction before question of merits helps keep courts within bounds of Article III, but Constitution does not require that courts always do so), the better practice is not "to test the outer limits of the [Supreme] Court's tolerance." *See Hardemon v.*

*Boston*, 1998 WL 219787, *1 (1st Cir. May 8, 1998).

Despite the fact that sovereign immunity "partakes of the nature of a jurisdictional bar," *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.*, 131 F.3d 353, 365 (3d Cir.1997), the Eleventh Amendment "enacts a sovereign immunity from suit, *rather than a nonwaivable limit on the federal judiciary's subjectmatter jurisdiction.*" *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, —, 117 S.Ct. 2028, 2033, 138 L.Ed.2d 438 (1997) (emphasis added). Thus, all I have done is choose one among potentially numerous bases upon which to dismiss the Sherman Act claim on the merits, rather than assume "drive-by jurisdiction[]," *Steel Co.*, — U.S. at —, 118 S.Ct. at 1011, for the purpose of dismissing the claim on the merits. *See, e.g., United States v. Vazquez*, 1998 WL 234725, *10 n. 4 (2d Cir. May 12, 1998) (failure to timely serve summons and complaint was non-jurisdictional and appeals court could proceed to decide case on merits).

**16.** Neither of the state law claims has been asserted against Iowa or Temple, both of which are public institutions, *see* Amended Compl. at ¶¶ 51–53, 64–65. Accordingly, the Court need not decide, at this point, whether they are entitled to, or have adequately pled, the defense of a sovereign immunity to these claims. *See Skehan*, 815 F.2d at 248; *Van Pilsum*, 863 F.Supp. at 936–39 (S.D.Iowa 1994); *see generally Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 117–122, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (holding that Eleventh Amendment applies to state law claims over which federal court exercises pendent jurisdiction).

trarily" in the processing of Bowers' application, *id.* at ¶¶ 250–51, 253, and that they imposed "additional, time-consuming, and more burdensome requirements on his application," *id.* at ¶ 252. *See also id.* at ¶ 225 (alleging existence of "unduly burdensome process, which the NCAA and its member schools have imposed on students with learning disabilities to determine their eligibility to participate in intercollegiate athletics").[17]

ACT and the Clearinghouse have moved for summary judgment on this claim asserting that the Clearinghouse did exactly what any contract with Bowers could reasonably have provided, that is, evaluate Bowers' information based on the NCAA's criteria and report the results. *See* ACT's Brief at 14–16. Summary judgment on the contract claim is inappropriate because, in light of Bowers' factual allegations, there remain numerous questions as to the nature of the contractual relationship between Bowers and ACT, and what obligations the contract, if any, imposed upon the parties, particularly with respect to the waiver procedure, *see, e.g.,* Amended Compl. at ¶ 249(c), (e).

## IV. Conclusion

For the reasons set forth above, the ADA claim (Count I) will be dismissed with prejudice as to ACT and the Clearinghouse. The Sherman Act claim (Count III) will be dismissed with prejudice as to ACT, the Clearinghouse, the NCAA, and Iowa, as well as non-moving Defendants, Temple and AIC. In all other respects, Defendants' motions will be denied.

### ORDER

This matter having come before the Court on the motion of Defendant, the National Collegiate Athletic Association, Charles J. Vinicombe, Esq., J. Freedley Hunsicker, Jr., Esq., John Schultz, Esq., and Julianne Peck, Esq. of Drinker, Biddle & Reath LLP appearing, to dismiss Counts I through IV of the First Amended Complaint filed by Plaintiff, Michael Bowers, Barbara E. Ransom, Esq. of the Public Interest Law Center of Philadelphia, Penelope A. Boyd, Esq., and Richard L. Bazelon, Esq. of Bazelon & Less appearing, or, in the alternative for summary judgment; and on the motion of Defendants, ACT, Inc. and the NCAA Initial–Eligibility Clearinghouse, Robert A. Burgoyne, Esq. of Fulbright & Jaworski LLP and Nicholas M. Kouletsis, Esq. of Pepper, Hamilton & Scheetz, LLP appearing, to dismiss Counts I through V of the First Amended Complaint or, in the alternative, for summary judgment, and on the motion of Defendant, the University of Iowa, to dismiss Counts I through III of the First Amended Complaint or in the alternative for summary judgment, Mark Schantz, Esq. and Andrew Ives, Esq. of the Office of the General Counsel, University of Iowa, and Thomas J. Miller, Esq., Attorney General, and Gordon E. Allen, Esq., Deputy Attorney General, appearing, and Isabelle Katz Pinzler, Esq., Acting Assistant Attorney General, John L. Wodatch, Esq., L. Irene Bowen, Esq., Philip L. Breen, Esq., and Daniel W. Sutherland, Esq., Attorneys, Disability Rights Section, Civil Rights Division, United States Department of Justice, Faith S. Hochberg, Esq., United States Attorney, and Louis J. Bizzarri, Esq., Assistant United States Attorney, appearing on behalf of *Amicus Curiae,* the United States of America, and

The Court having considered the submission of the parties; and

For the reasons set forth in an OPINION filed concurrently with this ORDER,

---

**17.** Bowers does not allege that he was owed a duty as the third-party beneficiary of a contract between the NCAA and/or its member-institutions, and ACT. *See* Amended Compl. at ¶ 35; *see, e.g., Phillip v. Fairfield Univ.,* 118 F.3d 131, 135–36 (2d Cir.1997) (expressing no view as to whether NCAA owed plaintiff "some sort of contractual duty ... as a result of the contracts between [university] and the NCAA and between [plaintiff] and the NCAA" and reversing grant of preliminary injunction for failure to apply proper standard in assessing breach of covenant of good faith and fair dealing under Connecticut law); *Hairston v. Pacific 10 Conference,* 101 F.3d 1315, 1320 (9th Cir.1996) (applying Washington law); *Hall v. National Collegiate Athletic Ass'n,* 985 F.Supp. 782, 796–97 (N.D.Ill.1997)(discussing third-party beneficiary theory as asserted against NCAA). Nor does Bowers allege that he entered into a contract with the NCAA, as opposed to the Clearinghouse and ACT, as a result of his application to the Clearinghouse. *See, e.g., id.* at 794–95 (discussing contract theory as asserted against NCAA).

IT IS HEREBY ORDERED on this 8th day of June, 1998, that Count I of the First Amended Complaint is DISMISSED with prejudice as to Defendants, ACT, Inc. and the NCAA Initial–Eligibility Clearinghouse; and

IT IS FURTHER ORDERED that Count III of the First Amended Complaint is DISMISSED with prejudice as to Defendants, ACT, Inc. and the NCAA Initial–Eligibility Clearinghouse, the National Collegiate Athletic Association, the University of Iowa, Temple University of the Commonwealth System of Higher Education, and American International College; and

IT IS FURTHER ORDERED that Defendants' motions are DENIED in all other respects.